UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Cristie R. Reynolds, et al,                   :        Case No. 1:13-cv-146
                                              :
         Plaintiffs,                          :
                                              :
vs.                                           :
                                              :
Chipotle Mexican Grill, Inc.,                 :
                                              :
         Defendant.                           :

**ORDER ON SUMMARY JUDGMENT MOTIONS**

Overview

Before the Court are seven motions for summary judgment filed by the

Defendant, Chipotle Mexican Grill, Inc. ("Chipotle").  Each motion seeks entry of

judgment on the claims of one of the seven Plaintiffs.  (Docs. 36-42)  Plaintiffs have filed

a combined response brief to all seven motions (Doc. 79), and Chipotle filed a

combined reply (Doc. 91).

The Plaintiffs are seven women who formerly held managerial positions in

Chipotle restaurants in the greater Cincinnati area.  Each of them was terminated, and

they filed this lawsuit alleging federal and state claims for gender discrimination.  (Doc.

1)  One plaintiff, Elizabeth Rogers, also brings a retaliation claim under the Family and

Medical Leave Act.[1]  Six of the seven Plaintiffs were General Managers of a local

Chipotle restaurant when they were terminated; one (Kerri Breeze) was an Apprentice

General Manager.  This is not a class action, but Plaintiffs allege that Chipotle "...

engages in a pattern and practice of discriminating against and/or terminating female

---

[1] Rogers has abandoned her FMLA interference claim; see Doc. 79 at 28, n.9.

managers." (Compl. at ¶78)  Each Plaintiff seeks reinstatement, compensatory

damages (back pay, front pay, and lost benefits), punitive damages, and attorney's

fees.  The Court will first review background information common to all Plaintiffs' claims,

and the legal standards that apply to analyze each of the pending motions.

**TABLE OF CONTENTS**

General Background ........................................................................................  3

    Chipotle Personnel ...........................................................................  3

    Management Hierarchy Overview  ....................................................  4

    Restaurant Audits .............................................................................  8

    Employee Performance Reviews ......................................................  10

Summary Judgment Standards ....................................................................  11

Gender Discrimination Standards ................................................................  12

Analysis of Plaintiffs' Claims .......................................................................  14

1.    Kerri Breeze (Doc. 36) .....................................................................  14

2.    Stephanie Ochoa (Doc. 37) ..............................................................  22

3.    Tina Reynolds (Doc.38)  ...................................................................  34

4.    Elizabeth Rogers (Doc. 39) ..............................................................  47

5.    Meghan Verplank (Doc. 40) ..............................................................  58

6.    Cristie Reynolds (Doc. 41)  ...............................................................  65

7.    Jennifer Hernandez (Doc. 42) ..........................................................  78

Conclusion          ..................................................................................  88

General Background

**Chipotle Personnel**:

**Brian Patterson** became a Team Director for the Cincinnati area market in March 2010, and was in that position when all seven Plaintiffs were terminated.  He transferred to Cincinnati from the Chicago area, where he had worked for Chipotle since early 2001.  He became an area manager in Chicago in December 2004.

**Michelle Small** was the Regional Director for the Cincinnati area, and was Patterson's direct supervisor from March 2010 until Patterson left Chipotle in April 2012. Small testified that she offered Patterson a demotion to a General Manager spot because he had not developed enough Restaurateurs in his area; Patterson chose to leave the company instead.  Small began working for Chipotle in March 2005 as an Area Manager in California, and was promoted to a position similar to a Team Director about six months later.  She became a Midwestern Regional Director in 2008, and was located in Chicago.  Small retired from Chipotle in March 2014.

**Herman Mobbs** joined Chipotle in April 2011 as an Area Manager, and spent approximately the first six months in training.  He had 15 years prior management experience in the food and beverage industry.  He voluntarily left the company in December 2013.

**Andy Ransick** began his employment with Chipotle in Cincinnati in 2003 as a crew member.  He was promoted to a general manager, and transferred to North Carolina in the spring of 2007.  He was promoted to a Restaurateur in December 2007. He returned to Cincinnati in May 2011 and as a Restaurateur, he was in charge of

managing three restaurants.

**Tim Spong** is the head of Chipotle's Safety, Security and Risk ("SSR") group. **Jennifer Clarke** worked with Spong. They and others in their group performed SSR audits (discussed below) at many of the Plaintiffs' restaurants, as well as throughout Chipotle's network. Spong is an attorney; he was formerly in private practice and was Chipotle's outside counsel in the 1990's. He became an employee in September 2006, as Director of Safety, Security and Risk. He has a staff of employees, including Jennifer Clarke, Patti Mann, and Ryan Dittoe, that perform restaurant field audits, as well as other functions relating to investigations and customer service.

**Candace Andreoni, Michael Triola**, and **Annie Campbell** work in Chipotle's Human Relations department. Triola's title was "People Support Director," and he reported to Michelle Small.

**Monty Moran** and **Steven Ells** are the co-CEO's of Chipotle, with headquarters in Denver, Colorado.

**Esther Smiley** is Chipotle's Compliance Manager.

**Management Hierarchy Overview**:

Esther Smiley's declarations filed in support of several of the motions, describe the company's managerial hierarchy. Hourly employees ("crew") staff each Chipotle restaurant. They are supervised and managed by a Kitchen Manager, a Services Manager, an Apprentice Manager, and ultimately by a General Manager. Kitchen and Services Managers are hourly employees; Apprentice and General Managers are salaried. A restaurant operates at "model" when it is fully staffed with these managers.

A General Manager is responsible for the overall operation of a restaurant.  The written job description for the position describes the duties and responsibilities, which include leading, hiring and training crew; developing promising employees into managers for promotion; building sales; implementing financial controls and preparing financial reports; and "demonstrating the management style that is reflective of Chipotle's values and culture."   (Doc 38-12, Ex. K, July 2010 General Manager Job Description.)

General Managers who meet certain quality and performance standards can be promoted to "Restaurateur," and then up through several Restaurateur levels (R2, R3 or R4).  These levels "directly correlate with how many restaurants he/she oversees and mentors towards Restaurateur.  A Restaurateur who develops more than four restaurants to Restaurateur status is then promoted to 'Apprentice Team Leader.' " (Doc. 41-2, Smiley Decl. at ¶ 11.)   (Chipotle documents and personnel often refer to a Restaurateur as "RT" and an Apprentice Team Leader as "ATL.")  Above the Apprentice Team Leaders are Team Leaders ("TL") and Area Managers ("AM"), who are responsible for larger geographic regions.  Apprentice Team Leaders, Team Leaders, and Area Managers report directly to a Team Director, who in turn reports to a Regional Director.

An internal company document gives an overview of the position of Restaurateur:

> Restaurateurs are our very best managers; they create a culture within their restaurant of high standards and constant improvement.  They work with each member of their team helping them excel, and they reward their best performers by giving them additional responsibility and opportunity for growth.  Restaurateurs focus on every aspect of the restaurant experience: food, service, and atmosphere.  For

> them, no detail is too small.  This results in a restaurant that is exciting for both crew and customers alike, and one that is financially successful as well.  Restaurateurs set the standard for all other managers. ...
>
> Restaurateur candidates are nominated by their Regional Director, and are selected by Steve [Ells] or Monty [Moran] after a restaurant visit and interview, including one-on-ones with the crew.

(Doc. 41-7, Ex. F, Restaurateur Overview.)  Area Managers and/or Team Leaders create a "Ready" list of restaurants for assessment visits by the Regional Director.  If the Regional Director approves the restaurant, it is placed on what Chipotle refers to a the "Now" list for a visit from Monty Moran and/or Steve Ells.

Moran testified that he makes the ultimate decision to promote a General Manager to Restaurateur.  The questions he would typically ask to make this decision include: "Is the general manager someone who cares about their people?  Do they seem to enjoy making others better?  Do they like to teach people?  Do they like to develop people?  Do they like to watch people succeed?  Can they communicate with their people in a way that their people can understand and relate to?  Are they ambitious?  Are they high energy?  Do they work hard?  Do they care about Chipotle? Do they have a vision for where their restaurant can go?"  (Doc. 51, Moran Dep. at 87-88)

Brian Patterson described a Restaurateur-readiness visit as one that gauges the "feel" of the restaurant, and the "energy, the empowerment, the engagement of the associates and team members."  (Doc. 65, Patterson Dep. Vol. 1 at 128)  In assessing a restaurant's readiness for promotion, Michelle Small said that she got most of the knowledge she needed simply by "sitting and talking to all of the crew.  You learn

everything that you need to learn about the culture, the leadership, about the people on the team from the crew."  (Doc. 82, Small Dep. at 22)  Alan Clark, a former Area Manager, testified that the standards for achieving Restaurateur status changed over time, and he thought it became a "nebulous feel good thing, everybody had to be harmonious and holding hands and singing the same song."  (Doc. 58, A. Clark Dep. at 52-53)

  Patterson testified that Chipotle generally expected a General Manager to be promoted to Restaurateur within six to twelve months.  (Doc. 65, Patterson Dep. Vol. I. at 96)  Monty Moran testified that there was no hard and fast time period within which a General Manager was required to achieve promotion to Restaurateur.  He said that "... it would always be our desire that someone become a Restaurateur sooner rather than later, but we don't put a time limit upon how long someone has to make it to that position.  Some people have taken many years to reach that position.  Some people have reached it very quickly. ... Some people have more potential to get there more quickly than others and that's okay."  (Doc. 51, Moran Dep. at 32, 34-35)  Michelle Small testified that a General Manager who doesn't reach Restauranteur is not automatically terminated, because the timeline to achieve that promotion "wasn't set in stone like a line drawn in the sand ...".  (Doc. 82, Small Dep. at 21-22)  Tim Spong testified that Chipotle did not have a "drop-dead guideline on a national basis" for promotion to Restaurateur, and that each market's operational leaders had the flexibility to decide.  He said that Chipotle has managers who have been with the company for years who are not Restaurateurs.  (Doc. 83, Spong Dep. Vol. I at 35-36)  Jennifer Clarke, who worked with Spong, also testified that Chipotle has General Managers who

have never been promoted to RT, and remain with the company.  (Doc. 49, J. Clarke Dep. Vol. I at 8)

**Restaurant Audits**:

Chipotle conducts regular "audits" of its restaurants to measure and monitor many aspects of operations.  Store-level restaurant reviews ("SL") are done by the General Manager at her own restaurant every two to four weeks; the GM must also perform a cash handling review every two weeks.  A "TL" (team lead) audit is conducted by Team Leaders or RT's approximately every 45 days.  In Cincinnati during the time at issue in this case, TL Audits were also conducted by other General Managers approved to perform them.  TL audits include the evaluation and scoring of multiple aspects of a restaurant's operations, and its compliance with Chipotle's cash handling policy.  (Doc. 41, Ex. S, is Chipotle's 2010 written cash handling policy.)   A score of 100% or "A" is the best possible operations score; points are deducted for operational problems or lack of compliance with Chipotle's restaurant procedures.  Cash handling compliance is scored in the opposite fashion, with points added for non-compliance.  A "zero" is therefore a perfect score for cash handling.

A corporate SSR (safety, security and risk) audit team visits each restaurant approximately once a year to perform an in-depth audit and review of a restaurant's operations and cash handling.  Before 2012, the SSR and TL audits used essentially the same written format to document the audit results.  Sometime in late 2011 or early 2012, the SSR audit forms began including a series of "Restaurateur Questions" at the start, seeking the auditor's opinion about the chances of the restaurant and its General Manager being promoted to RT.  (See, e.g., Doc. 87-1, Ex. 40, an August 2012 SSR

audit in the revised format.)  Tim Spong first initiated the SSR audits after he joined the company in 2006.  His initial focus was on improving cash handling procedures, because theft was a real problem in many Chipotle restaurants at that time.  Over time the SSR audits evolved to include restaurant operations. Spong said that SSR audits "provide another set of eyes in a restaurant," and an objective perspective from someone "who doesn't have an ax to grind, who has no involvement in" any local leadership issues, someone to "just come in objectively and provide an assessment of how the restaurant is operating and what the culture is like in the restaurant."  (Doc. 83, Spong Dep. Vol. I at 29-30)

Spong said that a cash handling score of 3 or less on an SSR audit is required to be eligible for promotion to Restaurateur, but he believes that the operations score is used as a "data point" for overall evaluation of the restaurant.  He did not believe that a certain operations score was required before a General Manager could be promoted. (Id. at 30-31)  Jennifer Clarke testified that no single operations grade would result in a manager's termination as a matter of course.  (Doc. 49, J. Clarke Dep. I at 9)  And one poor SSR audit is not, in Clarke's opinion, fatal to a promotion to RT.  (Id. at 7-8) Michelle Small avers in a declaration that an overall audit score of 60 or below, and a cash handling score of 4 and above, are considered failing scores.  (Doc. 38-2, Ex. A, ¶18-19)  In another declaration, Small states that an operations score of "D" or "F" is considered a failing score.  (Doc. 39-2, Ex. A, ¶15.)  Several audit reports list operations scores of "D-69," suggesting that a score of 70-79 points is considered a "C," and therefore a passing score.  Herman Mobbs testified that a cash handling score of 3 or lower is a pass, 4-5 is in a "yellow" caution area, and 6 or higher is failing.  (Doc. 63,

Mobbs Dep. at 120)

**Employee Performance Reviews:**

Chipotle employees have performance reviews on a regular basis.  General Managers are reviewed every six months, at mid-year and at year-end.  The manager evaluation form used for all of the Plaintiffs includes sections for the employee to complete a self-review, which is then critiqued and commented on by the employee's supervisor.  (See, e.g., Doc. 37-15, Ex. N, Stephanie Ochoa's 2010 Restaurant Management Performance Review.)   The employee provides a self-review of goals and accomplishments in four areas: (1) Develops Great Managers; (2) Builds Sales - Runs Excellent Restaurant(s); (3) Financial Success, measured by 7 factors (sales growth, profitability, labor costs, food costs, maintenance and repair, "throughput/15 minute transactions," and loss prevention/cash handling); and (4) Other (issues not covered by the first three topics).  The employee describes her long-term career goals in the company, and identifies the skills she needs to develop to accomplish those goals.  The final section is an overall performance rating for each six-month period and for a full year using a numbering system, with "1" being the highest, and "4" being the lowest. The rankings are defined as follows:

1:  Outstanding in all areas of his or her position.  Has a proven track record of consistently delivering excellent results in all aspects of his or her position.  Has been a positive influence beyond their areas of responsibility.

2.  Outstanding in many areas of his or her position.  Delivers excellent results in many aspects of his or her position.  Creates a positive influence in most areas of their responsibility.

3.  A reliable contributor.  Effectively applies themselves to the tasks of the position and typically delivers effective results in many aspects of his

or her position.

4.   Inconsistent performance.  Does not typically bring a positive influence to his or her area of responsibility.  Does not reliably accomplish the responsibilities of the position.  Performance must improve to stay in one's position.

Managers are eligible for discretionary, semi-annual performance bonuses depending upon their ratings; a manager whose performance rating is "4" is not eligible for a bonus.  (Doc. 42-12, Ex. K, 2011 Restaurant Manager Semi-Annual Bonus Plan.)

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The moving party has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002).  Once that occurs, the party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992).  Rather, the burden is on the non-moving party to "present affirmative evidence

to defeat a properly supported motion for summary judgment...," <u>Street v. J.C. Bradford</u> <u>& Co.</u>, 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. <u>Anderson</u>, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u> <u>Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id</u>. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted). The court must construe the record in the light most favorable to the non-movant, and draw all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

<u>Gender Discrimination Standards</u>

Each plaintiff alleges discrimination claims under Title VII and Ohio Rev. Code 4112. The Court will consider the federal and state claims together because the same legal standards apply. See, e.g., <u>Plumbers & Steamfitters Joint Apprenticeship Comm.</u> <u>v. Ohio Civil Rights Commission</u>, 66 Ohio St.2d 192, 196 (Ohio 1981).

None of the plaintiffs rely on direct evidence of gender discrimination. The familiar <u>McDonnell-Douglas</u> burden-shifting framework applies to their discrimination claims based on circumstantial evidence. In order to establish a prima facie case, each

of the plaintiffs must demonstrate: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class, or she was treated differently than similarly situated non-protected employees.  Newman v. Federal Express Corp., 266 F.3d 401, 406 (6th Cir. 2001).  Establishing a prima facie claim is not intended to be an onerous task.  Jackson v. FedEx Corp., 518 F.3d 388, 396 (6th Cir. 2008).  Chipotle must then articulate a legitimate, non-discriminatory reason for taking the adverse action.  Chipotle's burden is one of production, not persuasion.  Sjostrand v. Ohio State Univ., 750 F.3d 596, 599 (6th Cir. 2014).

The plaintiff must then demonstrate that the proffered reason is a pretext for sex discrimination.  She may do so by demonstrating that (1) Chipotle's stated reason has no basis in fact, (2) the reason given is not the actual reason for the termination, or (3) the reason is insufficient to explain Chipotle's action in terminating the plaintiff.  See Imwalle v. Reliance Med. Products, Inc., 515 F.3d 531, 545 (6th Cir. 2008), citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994).  The Sixth Circuit has made it clear that it has "... never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?' " Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012).

The Sixth Circuit has held that in order "... to survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale."  Blair v. Henry Filters, Inc., 505 F.3d 517, 532 (6th Cir. 2007).  "The key question is always whether, under the particular

-13-

facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." Id., quoting Macy v. Hopkins Cty. Sch. Bd., 484 F.3d 357, 365 (6th Cir. 2007).

## ANALYSIS OF PLAINTIFFS' CLAIMS

1.  **Kerri Breeze** was hired by Chipotle in December 2008 as a kitchen manager at the Cornell/Reed Hartman restaurant. Kevin Male promoted her to service manager, a job that Breeze described as very similar to kitchen manager but involving more frequent interactions with customers. Breeze considered Male to be her mentor because he hired her, trained her and promoted her. She received an "above expectations" rating on her September 2009 hourly crew performance review. (Doc. 57, Breeze Dep. Ex. 9) By that time she had transferred to the Northern Kentucky (NKU) restaurant, and her manager was either Kevin Male or Raul Hernandez. (Id., Breeze Dep. at 61-62) On her May 19, 2010 hourly service manager performance review, her overall rating was 2 out of 4, signifying that her performance "meets expectations." (Id., Breeze Dep. Ex. 10) Luis Martinez, who was her General Manager at this time, wrote in her review that he needed "to spend some more time with you because you need to be promoted soon!" Breeze helped train four kitchen managers, two of whom were promoted to service managers (Kevin Overmeyer, John Curran, Allison Reynolds, and Victor Contreras).

Within six months, Male and Brian Patterson promoted Breeze to apprentice manager, a salaried position, and transferred her to the newly-opened Kenwood Mall

restaurant in November 2010.  Patterson said that Chipotle chose the "strongest candidates" to open up the new restaurant.  Melvin Henriquez became Breeze's General Manger; Breeze said it "... was the first time that there was ever a Chipotle in a mall, in a courtyard. ... We were young, very green."  (Id., Breeze Dep. at 83)

Melvin Henriquez and/or Kevin Male completed Breeze's 2010 year-end salaried apprentice manager's performance review, which she signed on March 15, 2011.  (Id., Breeze Dep. Ex. 12)  Henriquez and Male met with her that day to discuss the review, in which Breeze rated her own performance as "3" out of 4.  Male crossed out the "3" and checked "2."  Breeze wrote that her goal for the following quarter was to be promoted to General Manager, and to help her restaurant (and Henriquez) become a Restaurateur. Breeze said that neither Male nor Henriquez offered any criticism of her performance at her annual review, and her written evaluation lacks any negative comments or suggestions for improvement from either Male or Henriquez.  Breeze described Melvin Henriquez as a "leader," and said she got along very well with him.  He never treated her differently due to her gender, or treated men more favorably.  Annie Campbell (Chipotle HR) visited the Kenwood restaurant around this time, and told Breeze that she would be "a restaurateur in no time."  (Id., Breeze Dep. at 126)

Michelle Small and Brian Patterson visited Breeze's restaurant sometime in March 2011 (the precise date is not stated).  Small testified that Breeze "didn't look comfortable" working with her crew.  (Doc. 82, Small Dep. at 165)  According to Patterson, Small said that Breeze was a "low performer" that day because she was "not engaging in conversation, seeking feedback, or taking ownership" in the restaurant. (Doc. 65, Patterson Dep. Vol. I at 178-179)  Small told Patterson that Breeze should be

-15-

fired, because she was preventing Henriquez from being put on Small's "ready list" for a

Restaurateur assessment visit. Small denied saying these things to Patterson. (Doc.

82, Small Dep. at 166) Breeze testified that during this visit, Patterson ignored the

female employees, while both Patterson and Small were friendly to the males. Breeze

called Kevin Male and Melvin Henriquez (who apparently were not at the restaurant that

day), telling them that the visit from Small and Patterson "... was horrible, they basically

came in and did not speak to me and I just felt belittled and embarrassed." (Doc. 57,

Breeze Dep. at 149) Patterson called Male and told him that the visit did not go well,

and that Patterson and Small "were disappointed in [Breeze's] performance during the

visit. That ... she really wasn't standing out as a leader when they were present. That

she kind of faded into the background and kind of hid." (Doc. 62, Male Dep. at 62)

Male recalled that Melvin Henriquez was upset after Small's visit because he wanted to

get promoted, and Small's negative reaction would jeopardize his chances.

Kevin Male terminated Breeze on May 13, 2011. Breeze testified that she

opened the restaurant that day; sometime after lunch, Male came in to speak with her.

He said he was sorry he had been ignoring her, but he gave her the choice of quitting or

being terminated. Breeze testified that Male told her that he was

> ... on the phone with Brian [Patterson] and Michelle [Small] in a screaming
> match telling them that they are making the wrong decision in firing you. ...
> they had stated that you will never move up in Chipotle and [Male] said,
> the good news is we can go have a drink together now. And I said, I
> guess I'm going to be fired because I don't want to quit. There is no
> reason for me to quit. And [Male] just said I need to take your keys and
> we need to go inside the restaurant and get your belongings and that was
> it.

(Doc. 57, Breeze Dep. at 188) Male disagreed with Patterson when he told Male that

Breeze needed to be fired. After several discussions between them, Male agreed to convey Patterson's decision to Breeze but made it clear that it was not his decision. (Doc. 62, Male Dep. at 89-91) Breeze's termination form cites her unacceptable work performance as the reason for her termination. Melvin Henriquez submitted a declaration in support of Chipotle's motion, in which he avers that Breeze was not a good leader. She would "constantly undermine my authority and disagree with me on almost every decision I made...". He never saw her show "any passion or caring" for the restaurant, and he believed that she was dragging his team down. (Doc. 36-12, Ex. K, Henriquez Decl. at ¶¶ 7, 10)

Breeze said that during her employment with Chipotle, she had less than ten interactions with Patterson. He would visit the restaurant and point out things that were incorrect; she said "it was just intimidating having someone look over your shoulder." (Doc. 57, Breeze Dep. at 133) She actually spoke to him only occasionally. During his last visit to Kenwood with Michelle Small, Patterson approached her and said "you seem kind of off today." Breeze responded that "... there's a lot of pressure. I want to become restaurateur[,] and that was it and they left." (Id., Breeze Dep. at 134) She admitted that Patterson never made any sexist comments to her, and she did not see him treat men better than he treated her. Michelle Small visited the NKU restaurant once or twice when Breeze worked there. One visit was shortly after that restaurant was first open, and the crew was a little late opening the doors that day. Breeze opened the doors for Small, who talked to her crew briefly and then left. The only thing Small said to Breeze was to ask her why she opened ten minutes late. Breeze said that Small "just put everybody on edge" when she visited restaurants. (Id. at 140)

Chipotle argues that Breeze cannot establish a prima facie case. It relies on Esther Smiley's declaration that Apprentice Manager Allison Reynolds replaced Breeze. (Doc. 36-2, Ex. A, Smiley Decl. at ¶20) Breeze testified that she thought Kevin Overmeyer replaced her, but admitted that this is "speculation, [because] he was next in line to be promoted." (Doc. 57, Breeze Dep. at 167) In Plaintiffs' response memorandum, Breeze contends that Victor Murillo (Contreras) replaced her. Breeze cites Chipotle's response to her interrogatory asking for the identity of anyone who "performed any of her job duties since her termination." Chipotle identified Victor Murillo, not Allison Reynolds. To explain the discrepancy, Chipotle states that after it responded to Breeze's interrogatory, "further investigation" revealed that Allison Reynolds actually replaced Breeze. Chipotle relies on personnel status forms showing that Reynolds was promoted to kitchen manager ten days after Breeze was terminated. She was promoted to service manager on July 18, and from apprentice to general manager on September 12, 2011. The date of her promotion to apprentice manager (Breeze's position when she was fired) is not apparent. Victor Murillo was promoted to kitchen manager on June 20, to service manager on September 12, and to apprentice manager on November 7. (Doc. 91-1, Exs. A and B)

These forms apparently demonstrate that no one was promoted to apprentice manager immediately following Breeze's termination; then sometime between July and September, Reynolds was apparently promoted to apprentice before Murillo. Kevin Male testified that Allison (Reynolds), "Bryce," or Victor Murillo assumed Breeze's position, but he also recalled that her position was vacant for a period of time. When he reviewed the status change form promoting Murillo to apprentice manager, Male

testified that he promoted Murillo to be the next apprentice manager at the Kenwood Mall restaurant. (Doc. 62, Male Dep. at 97-99)

Breeze also asserts that four male employees were treated more favorably than she. She asserts that Kevin Overmeyer and John Curran were treated more favorably because "they were training [them] faster," and they were quickly promoted from kitchen manager to service manager. Breeze did not know their prior job history or the reasons that they might have been promoted more quickly. (Doc. 57, Breeze Dep. at 168-170) She believes that Patterson and Small treated Kevin Male better based on their visits to the restaurant, when they were more friendly towards Male. The same was true for Victor Murillo. She also asserts that Murillo was treated more favorably because he was given 7 months to develop his skills as an apprentice manager, but Breeze was terminated "two weeks after she was allegedly identified as lacking skills." (Doc. 79 at 25)

To satisfy her prima facie burden of proof, Breeze must show that the male comparators were similarly situated to her in all relevant aspects of their jobs. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). She has not shown that Overmeyer and Curran were similarly situated because they were not salaried managers; her subjective impression that they were being trained "faster" is not sufficient. Kevin Male is not similarly situated to Breeze, as she tacitly admits; Male was her mentor and supervisor, and had very different responsibilities. It is unclear what the basis is of Breeze's assertion that Murillo had 7 months of apprentice training while she was fired after two weeks. Male said that Patterson told him to fire Breeze very shortly after the Small/Patterson visit in March, but the actual termination did not occur

-19-

until May 12, some two months later.  Male also testified that after Murillo was promoted to apprentice, he was promoted again to General Manager about a year later, after Henriquez became a Restaurateur.  (Doc. 62, Male Dep. at 98-99)  The Court assumes that Breeze is referring to the longer period of time that Murillo was given to achieve promotion to General Manager.   Based on that evidence, plus the fact that Male testified that Murillo replaced Breeze, which differs from Smiley's declaration, the Court finds that Breeze can establish a prima facie claim.

Chipotle contends that it terminated Breeze because she did not display "leadership," and "faded into the background" when Small and Patterson visited her restaurant in March 2011.  Patterson testified that despite feedback from him and Male, Breeze failed to show that she was "an engaged dynamic leader." (Doc. 65, Patterson Vol. I at 185)  Small allegedly told Patterson that Breeze was a "low performer," because she was not "engaged, does not absorb any kind of feedback, does not even want to be a part of the discussion going on in the restaurant."  (Id. at 178)  Patterson said that Breeze "didn't represent herself well with visitors," but he did not know or remember what Breeze was actually doing during his visit.  He admitted that she may well have been filling in for her crew members who were being interviewed by Small or Patterson.

Chipotle urges the Court to infer that because she is a female, Small would not discriminate against Breeze, and Patterson would not fire her only a few months after promoting her to apprentice.  These "same group" and "same actor" inferences may be permissibly drawn by the trier of fact.  But at the summary judgment stage, the Court may not draw an inference in favor of Chipotle, the moving party.

-20-

Breeze also argues that Chipotle's stated reason for her termination is so vague and subjective that it in itself raises an inference that the stated reason was not the actual reason.  Simply showing that an employer's performance standards are subjective does not mean that reliance upon those standards is automatically suspect, or that it is sufficient to raise a genuine dispute about pretext.  But the Sixth Circuit has also cautioned that such

> ... subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination. ... [T]he legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority. ... The Supreme Court in *Burdine*[2] voiced similar concerns.  The Court stated the articulated reasons must be "clear and specific" to rebut the prima facie case and guarantee that the plaintiff will be afforded "a full and fair opportunity" to demonstrate pretext. ... Obviously the more subjective the qualification and the manner in which it is measured, the more difficult it will be for the defendant to meet the burden imposed by the court in *Burdine*.

Grano v. Dep't. of Dev., 699 F.2d 836, 837 (6th Cir. 1983)(internal citations omitted).

To challenge Chipotle's stated ground for her termination, that she was not an "engaged dynamic leader" and "faded into the background," Breeze relies on additional circumstantial evidence that she contends raises a reasonable inference of discrimination.  Male said that Patterson told him to terminate Breeze.  Patterson testified that Small told him that Breeze should be fired, but Small denied making that statement to Patterson.  Henriquez's declaration avers that before Small's visit, he spoke to Male "on multiple occasions" about his frustrations with Breeze.  Yet in mid-

_____

[2] Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).

March 2011 (on her year-end review), Henriquez and Male rated her performance as "2" out of 4, meaning she was "[o]utstanding in many areas of his or her position.  Delivers excellent results in many aspects of his or her position.  Creates a positive influence in most areas of their responsibility."  Breeze testified that Henriquez did not criticize her performance at her review or at all before she was terminated.  And Male testified that before Small and Patterson visited the restaurant in March 2011, he did not have concerns about her performance and had not spoken to Breeze about any  concerns.

    After considering the evidence and the parties' arguments, the Court concludes that Breeze has established a genuine dispute whether Chipotle's stated reason for her termination is the actual reason or was sufficient to justify her termination.  Chipotle is not entitled to summary judgment on her claims.

2.    **Stephanie Ochoa** began her employment with Chipotle in June 2005, and was promoted to General Manager in 2006.  Sometime thereafter she took a disability leave, followed by an unpaid medical leave.  She did not return to work when her leave ended, and she was terminated in March 2009.  Cris Reynolds, who was an Area Manager at that time, rehired her as a crew member at the Kenwood Road restaurant on November 23, 2009.  Reynolds quickly promoted Ochoa to Kitchen Manager, and then to Service Manager.  Reynolds and Brian Patterson promoted her to Apprentice Manager of the Fountain Square restaurant on March 29, 2010, and Kevin Male promoted her to General Manager on September 13, 2010.

    Cris Reynolds told Ochoa that Chipotle expected its General Managers to be promoted to Restaurateur, and that Reynolds was expected to help her GMs achieve that goal.  After Ochoa became General Manager, Reynolds visited her restaurant once

-22-

a week, sometimes for one shift and other times for the entire day, to help Ochoa reach

Restaurateur status.  (Doc. 64, Ochoa Dep. at 81-84)  Reynolds completed Ochoa's

Dec. 28, 2010 managerial performance review, which covered the last quarter of 2010.

Reynolds noted that Ochoa had not reduced her employee turnover rate, but also

recognized that Ochoa needed to terminate some employees at her restaurant.

Reynolds stated that Ochoa "strives for constant improvement and requires this from

her team."  Reynolds rated her at 2 out of 4 overall for this period.  (Doc. 37-15, Ex. N)

In January 2011, Cris Reynolds was demoted from Area Manager, and Brian

Patterson became Ochoa's AM.  Patterson completed her July 2011 mid-year review,

where he noted that Ochoa had done a good job "getting back to basics" and "creating a

strong learning culture. ... One opportunity is making sure you don't have any low

performers on your team.  I know you've removed some, but we must remove all.  You

have been there long enough to know the people that are going to grow with you and

the people who are not. ... Herman [Mobbs] is looking for leaders and I'd like to see you

step up and assist when possible and encourage too [sic]."  (Doc. 37-16, Ex. O at 1-2)

Patterson also told Ochoa that Chipotle expected new General Managers to achieve

promotion to Restaurateur within 6-8 months after starting, and that current GM's should

be close to being promoted.

Patterson also discussed Ochoa's "Shopper Review" results.  These reviews are

completed by anonymous visitors to the restaurant who rate multiple aspects of food,

service, and restaurant atmosphere as "Great," "OK," or "Nope."  (It is not clear when

Chipotle began using these reviews to gauge the performance of its General Managers,

or who the anonymous visitors are.)  Chipotle expects that each restaurant will receive

aggregate total ratings of at least 87% "Great," 9% "OK," and 4% "Nope." Ochoa did not

meet these goals; she received 85.1% "Great," 7.6% "OK," and 7.3% "Nope." Her sales

growth was below her target, and she conceded that meeting her labor costs target was

a struggle. She also admitted that she had not met her goal of substantially and

consistently improving the restaurant. Patterson wrote that Ochoa "generally has tight

financials" but her labor cost index ratio was poor. Patterson gave her an overall rating

of 3 out of 4.

Ochoa admitted that it was difficult for her to fire some of her employees, even

though she knew her restaurant would improve if she did. (Doc. 64, Ochoa Dep. at 64-

65) Ochoa described the Fountain Square restaurant as the "toughest store" she had

ever managed. There were several incidents involving homeless people wandering in

and causing fights, which eventually required Chipotle to hire a security guard for the

evenings. She had trouble recruiting reliable employees from nearby neighborhoods.

In mid-2011, one of Ochoa's employees filed an EEOC claim against Chipotle,

contending that she and other employees heard racially offensive remarks while

working for Ochoa, and that Ochoa fired her after she complained. The employee later

sued Chipotle, and Ochoa was deposed in that action.[3] Chipotle cites these events but

does not claim that it disciplined or terminated Ochoa because of this employee's claim.

Herman Mobbs replaced Patterson as Ochoa's Area Manager in August or

September 2011. Mobbs and Patterson both told Ochoa that she should be able to

achieve Restaurateur status almost immediately, because she had been a General

---

[3] Cousins v. Chipotle, Case No. 1:12-cv-292-SAS (S.D. Ohio, complaint filed
April 23, 2012).

Manager for a year.  To further his goal of encouraging his General Managers to become Restaurateurs, Mobbs created a team of managers he believed were likely Restaurateur candidates, to mentor each other and visit each other's restaurants for helpful input.  (Doc. 64, Ochoa Dep. at 159)  Mobbs chose Ochoa to be a member of this team. Two other team members, Luis Martinez and "Erick" (presumably Erick Arce, GM at the Burlington restaurant), visited the Fountain Square restaurant on February 11, 2012 for one of these "team" visits.  Martinez made notes of their visit (which he entitled "Diagnose Fountain Square"), and sent a summary in an email to Ochoa.  He listed some "great" things about her restaurant, and a longer list of items that needed cleaning and operational issues that needed improvement.  Martinez told Ochoa that they both had opportunities to improve, and that some of his observations were based on feedback he had received about his own restaurant.  (Doc. 37-30, Ex. BB)

The parties have not cited any audits that may have been done at Fountain Square between September 2010, when Ochoa became the General Manager, and August 14, 2011, when Alan Clark performed a TL audit at Fountain Square.  Clark gave the restaurant an operations score of C-76 and a cash handling score of 1. Clark's summary states that "... [t]here have been improvements in the people and operational standards since the last time I was here."  He noted that food was not kept at required temperatures, and there were several "opportunities for improved cleanliness."  He also noted that DCR's (daily cash reports) were "well organized and accurate."  (Doc. 37-26, Ex. X)  Ochoa admitted that his observations were important. (Doc. 64, Ochoa Dep. at 218-219)

Kevin Male and Herman Mobbs performed a TL audit on September 30, 2011.

Male gave an operations score of C-71, and cash handling score of 2.[4]  He and Mobbs

noted that the overall visit was good, but "we were very detail focused in our

observations.  The team was very receptive to the feedback and I look forward to

working with the Fountain Square Team."  (Doc. 37-28, Ex. Z)  Mobbs conducted a TL

audit on December 27, 2011, and gave her an operations grade of B-80 and cash

handling score of 3.  He summarized his visit as "okay, but [Ochoa] and her team need

to get this restaurant to great and they have the potential to do so.  Many of the issues I

noted during my last visit have been addressed and the restaurant looks much better

overall."  Mobbs noted that there were some inconsistent cut sizes of food, and some

areas in the back of the restaurant that needed cleaning.  But he stated that if those

issues were addressed, "this restaurant should score no less than an A on the next

audit."  (Doc. 37-29, Ex. AA)

     Sometime in January 2012, Patterson, Mobbs, Luis Martinez, and Kevin Male

visited Ochoa's restaurant for 5 to 6 hours, to give her advice on achieving promotion to

Restaurateur.  Ochoa took notes of their comments and suggestions, including specific

recommendations to fire some of her employees.  They told her that the restaurant

needed detailed cleaning, more attention paid to "mise en place" (Chipotle's phrase for

restaurant organization and food preparation, apparently meaning "everything in its

place"), and regular daily training for her crew.  Patterson told Ochoa that her restaurant

was 100% better than it had been in September when he last visited.  But Mobbs

thought her operations had grown worse since his last audit in December; as a result,

---

[4] Ochoa testified that Male was training Mobbs and Male actually performed the
audit, even though Mobbs' name appears on the form as the auditor.

Mobbs removed her from his General Manager "team" so that she could concentrate on improving her restaurant. (Doc. 63, Mobbs Dep. at 146) Ochoa's profit/loss report for February 2012 reflected negative cost variances for food, labor, services and uniforms. Ochoa admitted these results were not good, but she attributed it in part to the fact that some of her employees were stealing food.

Mobbs conducted another TL audit on March 2, 2012, and gave Ochoa an operations grade of D-61, and a cash handling score of 3. (Doc. 37-33, Ex. EE) Mobbs complimented her employees for "a great job today during the peak lunch period." He noted that while there had been "great improvements at Fountain Square over the past two months, I was disappointed overall in my visit today," especially noting the lack of detailed cleanliness of the restaurant and several food preparation issues. Ochoa disagreed with Mobbs' observations; she testified that Mobbs "was in just a horrible mood and he was nitpicking everything." He also changed his instructions and expectations on the proper cut sizes of food items: "It was always, every time he came in, it was always something more, something new, something different and I told him that I was overwhelmed with every time he was here, it was a change of this or a different procedure, a different policy ...". (Doc. 64, Ochoa Dep. at 233) Ochoa thought that Mobbs expected her to meet impossible standards of perfection and cleanliness, and that Mobbs was "pushing me so hard to get to Restaurateur by April that it was just overwhelming. ... [T]here was no way I was going to get to Restaurateur by April, and that's what he wanted me to do." (Id. at 234)

Ochoa conceded that the close scrutiny she received from Mobbs on this TL audit was similar to what she experienced during an SSR audit that Jennifer Clarke

performed on March 8, 2012. Clarke gave her an operations grade of C-77, and a cash

handling score of 8. In her audit report, Clarke first answered the eight "Restaurateur

Questions" (which would help determine if she ready for a visit from Michelle Small) and

answered all eight questions negatively. She wrote that the restaurant lacked a team of

top performers; only five of the crew were "outgoing and personable," and she identified

at least two others as "low performers." Some employees displayed knowledge of

Chipotle's high standards and some did not. Clarke concluded: "I am not confident that

[Ochoa] will be a Restaurateur. [She] has been a GM here at Fountain Square for 3

years[5] and she seems motivated to become a Restaurateur but after meeting her

employees, I do not think she truly knows what kind of people she has to have on her

team in order to create a Restaurateur culture." (Doc. 37-34, Ex. FF at 1)

Clarke deducted cash handling points because Mobbs had not done two of the

required TL audits over the past three months; she also deducted points on operations

because two employees were not wearing slip-resistant covers on their shoes. Ochoa

thought both of these deductions were unfair. She explained to Clarke that shoe covers

(which were available if employees forgot to wear slip-resistant shoes to work) were in a

backroom that was not accessible that day because a repairman was on a ladder

working in the ceiling, and had blocked the backroom's entrance. And Ochoa did not

believe it was her responsibility to make sure Mobbs did his job by timely completing TL

_____

[5] Ochoa became the General Manager at Fountain Square in September 2010, and had been promoted to Apprentice Manager in March 2010. At the time of the SSR audit she had been the GM at Fountain Square for 18 months, not three years.

-28-

audits.[6]  Clarke told Ochoa during her visit that the audit scores were not a reason that she would be terminated.

When she read Clarke's written report shortly after the audit, Ochoa tried to reach Mobbs right away to talk to him because she was concerned about it.  Ochoa was not able to reach Mobbs and did not talk to him until March 12, when Mobbs and Kevin Male appeared at her restaurant.  Mobbs told Ochoa that he was terminating her because she was not a "good fit" for Mobbs' team.  (Doc. 64, Ochoa Dep. at 304)  Her termination form cites unacceptable work performance as the reason for her termination, and she is not eligible for rehire.  (Doc. 37-35, Ex. GG)  Ochoa was replaced by a male, Scott Phillippo.

Chipotle argues that Ochoa cannot establish a prima facie discrimination claim, because she was not qualified for her position.  It contends that her performance declined after she became General Manager of the Fountain Square restaurant.  Her supervisor, Cris Reynolds, had criticized some of her abilities in her December 2010 performance review.  (Doc. 37-15, Ex. N)  Ochoa had not been promoted to Restaurateur, despite serving as General Manager for 18 months.  Chipotle also cites her deposition testimony in the <u>Cousins</u> lawsuit, where Ochoa admitted that she allowed some crew members to use their employee discount to buy meals for friends and family, which violated Chipotle's cash handling policies.  (Doc. 37-32, Ex. DD at 120, 121-122)  But in that deposition, Ochoa explained that Mobbs told her it was acceptable to do this,

---

[6] Tim Spong testified about a different audit for a different general manager.  He agreed that if Mobbs failed to perform regular TL audits for that manager, the restaurant manager should not be held responsible for his failure to do so.  (Doc. 84, Spong Dep. Vol. II at 111-112)

in order to give employees a "reward every now and then," even though the handbook stated otherwise. (Id. at 122-123)  Chipotle further notes her false answer to a question on her employment application asking if she had any criminal convictions.[7]

The Sixth Circuit recently reaffirmed the principle that the district court must not conflate the qualification prong of a prima facie case with the employer's asserted justification for the adverse action.  Loyd v. St. Joseph Mercy Oakland, 766 F.3d 580, 590 (6th Cir. 2014).  A plaintiff's qualifications must be measured objectively, and the Court may not consider the employer's explanation for the adverse action while evaluating those qualifications.  Wexler v. White's Fine Furniture, 317 F.3d 564, 574-575 (6th Cir. 2003)(en banc), citing Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-661 (6th Cir. 1999).  Chipotle rehired Ochoa in November 2009, and she had been a General Manager in her previous period of employment with Chipotle.  After she was rehired she was promoted rather quickly to General Manager in September 2010.   Her performance reviews and her audit scores (prior to the last two audits) do not show that she was **objectively** unqualified to perform her job duties.  Rather, the evidence suggests that Chipotle considered her close to promotion and was consistently encouraging her to achieve that goal.  The Court finds that Ochoa has satisfied her prima facie burden of proof.

Chipotle contends that it terminated Ochoa for inadequate performance, claiming that she failed to build a "pipeline" of employees to replace her managers and crew when she experienced turnover.  (Doc. 37-1 at 16)   Her performance declined after she

---

[7] Ochoa admitted that she had two misdemeanor convictions, but thought the question was limited to felonies.

became General Manager, culminating in her unsuccessful SSR audit in March 2012 that immediately preceded her termination. Ochoa contends that this explanation is a pretext for gender discrimination, offering a number of arguments. To challenge the factual basis of Chipotle's asserted justification, Ochoa must show that the decision to terminate her was so unreasonable, or "so ridden with error that [Chipotle] could not honestly have relied upon it." Wexler, 317 F.3d at 576 (quoting In re Lewis, 845 F.2d 624, 633 (6th Cir. 1988)). Ochoa does not genuinely dispute the factual observations recorded in Clarke's SSR audit. But she blames the results on the restaurant's poor physical condition, Clarke's assessment of points against her for not assuring that shoe covers were accessible to her employees, and on cash handling errors that were Mobbs' responsibility.

The court should not second-guess an employer's termination decisions so long as they are honestly based upon particularized facts regarding the employee's performance. That decision can be shown to be factually incorrect or even unfair, but a plaintiff must do more than identify a factual error or assert unfairness. For instance, in Sybrandt v. Home Depot, U.S.A., 560 F.3d 553, 560-561 (6th Cir. 2009), the court rejected plaintiff's argument that her employer's overly strict interpretation of a policy prohibiting employees from placing personal merchandise orders using work ID's was a pretext for discrimination. She argued that the policy should have been more detailed, and that her technical violation did not involve dishonesty or theft. Those arguments failed to rebut her employer's honest belief in the particularized facts showing that she had in fact violated that policy. Ochoa cannot create a genuine factual dispute by challenging Chipotle's standards, or arguing that Clarke should not have held her

-31-

responsible for the fact that her employees lacked slip-resistant shoe covers.

She also argues that Mobbs treated male managers more favorably, to argue that her gender was the actual reason she was terminated. Mobbs sat with male managers Scott Phillippo and Luis Martinez at meetings and socialized with them. She believes that Mobbs spent more time with male managers helping them at their restaurants. And she asserts that Mobbs transferred some of her trained employees to other restaurants, which hampered her efforts to get promoted. Ochoa concedes that Mobbs seemed genuinely interested in helping her succeed, and both Patterson and Mobbs came to her restaurant for a 5-6 hour visit in January 2012, specifically to help her achieve promotion to Restaurateur. Her subjective impressions that Mobbs or Patterson got along better with men, or spent more time interacting or socializing with men, is not sufficient to raise a genuine factual dispute that Mobbs gave her a bad audit or terminated her based on her gender. The Sixth Circuit has held that "generalized allegations about the comparative warmth" displayed towards non-minority employees are not sufficient to raise a genuine dispute about discriminatory intent. Taylor v. Union Inst., 30 Fed. Appx. 443, 450-451 (6th Cir. 2002)(unpublished).

Ochoa also argues that the two audit scores were insufficient to justify her termination, because other male general managers who received scores that were comparable to or worse than hers were not fired. Small testified that Ochoa's SSR audit raised concerns as soon as she saw it, because it was not a "great" score, and "... it's not acceptable to continue to get this over and over and over again." (Doc. 82, Small Dep. at 184) But Ochoa's prior audit scores were never more than 3 on cash handling, which Chipotle admits is a passing score. And other than Mobbs' critical TL

audit a few days before the SSR audit, her operations scores were passing under Chipotle's standards, so it is not clear what Small was referring to in her testimony. Tim Spong testified that in 2012, the national average SSR operations score was 83-84, and he described a score of 79 on a different SSR audit as "somewhat below average but ... not a terrible score." (Doc. 84, Spong Dep. Vol. 2 at 112)

Male general managers received comparable or worse audit scores but were not fired. Christian Armenta became the General Manager at the Kenwood Road restaurant on August 15, 2011. His TL audit scores on September 30 and December 30, 2011 were D-67/5 and D-69/4, respectively, and his March 31, 2012 audit score was C-71/5. On August 21, 2012, he had an SSR audit resulting in a score of D-62/5. (Doc. 79-11, Ex. 14:15-24) Andy Ransick testified that he recalled visiting Armenta's restaurant with Michelle Small, Brian Patterson and others, and the operations were so bad that Small closed the restaurant for five or six hours. Ransick said that they "overhauled all of the food, talked with the [restaurant] team, took care of all of the food safety issues and got them back open. It was a fiasco." (Doc. 66, Ransick Dep. at 110-111) Armenta was not terminated, and he remained employed with Chipotle until he voluntarily resigned in June 2013. Jose Garduno became a General Manager on March 6, 2012; his TL audit scores in 2012 were D-69/6, D-69/9, C-73/4, C-75/2, C-75/6, and C-75/5. (Doc. 79-11, Ex. 14:25-46) He was not terminated, and he left his job voluntarily in January 2014. Scott Phillippo (Fountain Square GM) received audit scores of C-76/1 on August 14, 2011; C-74/5 on August 3, 2012; and D-69/5 on June 29, 2013. On the last report, the auditor (Samuel Revis, a Restaurateur) stated that Phillippo was "not yet" at the Restaurateur level. (Doc. 79-12, Ex. 14:59-66) Despite

-33-

these results, Phillippo was not terminated.

The Court concludes that Ochoa has established a genuine factual dispute about whether the reason proffered by Chipotle for her termination was sufficient to justify her termination, given the evidence that male GM's with a record of significantly lower audit scores were not terminated. Chipotle is not entitled to summary judgment on Ochoa's claims.

3. **Tina Reynolds** graduated from the University of Cincinnati in 1997, and then worked at several different restaurants in various positions. She began working for Chipotle in October 2009, when Alan Clark hired her as a cashier at Chipotle's "Dream Street" (Florence, Kentucky) restaurant; Alan Clark was then the Area Manager. Tina Reynolds learned about Chipotle through her acquaintance with Kerri Breeze and Will Whitworth (a former General Manager), who described Chipotle's culture and positive approach to customer service and food freshness. During her first interview, Alan Clark told her she could fast-track to management positions in the company by training in each position and moving up through the hierarchy, given her background and work experience.

Reynolds did move up quickly in the company, and she believed that Chipotle's system was relatively easy to learn. She was promoted from cashier to Kitchen Manager one month after she started; during this time she had one-on-one attention from Will Whitworth, her General Manager. She was promoted on November 23, 2009, from Kitchen Manager to Service Manager, and again on December 7, 2009 to Apprentice Manager for a new restaurant at Northern Kentucky University. Luis Martinez was the General Manager at NKU, and Reynolds got along well with him while

she worked at NKU.  She had no indication that he preferred working with men.  All of these promotions were approved by Alan Clark, who also completed Reynolds' 2009 year-end performance review (signed in March 2010), while she was still the Apprentice Manager at NKU.  Clark noted that she was new to Chipotle and to that restaurant, and was "sometimes blindsided by operational issues that she hasn't encountered before." (Doc. 38-13, Ex. L)  Clark gave her an overall rating of "3" out of 4, meaning that she was a "reliable contributor."

Reynolds was promoted from Apprentice to General Manager six months later, on July 5, 2010.  Chipotle transferred her to its Western Hills restaurant, because that location needed improvement.  The Western Hills location was one of Chipotle's oldest facilities in the Cincinnati area, and the physical condition of the restaurant was in very bad shape when she arrived.  The facility was dirty, was infested with roaches, and the majority of the employees spoke only Spanish (which Reynolds did not speak).  Clark warned her that she had "a big mountain to climb" in improving the restaurant, but he had confidence she could do it.  (Doc. 68, T. Reynolds Dep. at 181)  Alan Clark completed her year-end 2010 review, which included her first six months as General Manager at Western Hills.  Clark noted that she "demonstrated great leadership" and had worked very hard to remove several "low performers [and] a low performing Apprentice. ... [H]er management team is thriving under her leadership and ... [she] is close to creating the restaurateur culture in her store."  (Doc. 38-14, Ex. M at 2)  Clark rated her performance as "2" out of 4 overall, meaning she was "outstanding in many areas" and "delivers excellent results."

Alan Clark was demoted from Area Manager to General Manager in January

2011, and Brian Patterson became Tina Reynolds' AM. (Patterson had been Clark's superior; Reynolds met him when he came to the NKU restaurant after it opened, and when she was promoted to General Manager, but her interactions with him until 2011 were limited.) Reynolds testified that Patterson did not give her as much feedback as Clark had given her, and he refused her requests to purchase new restaurant equipment. She said that she could not replace "... some of the equipment, shelving, casters, tile work. There [were] old metal walls that were peeling off and deteriorating. The floor was horrendous. It needed to be repaired. Cracks in the wall, everything in the back of the house was really old, it needed to be replaced." (Doc. 68, Reynolds Dep. at 182) She also observed that Patterson spent more time with male managers (particularly Coran Stetter and Melvin Henriquez) in their restaurants than he did with her.

Patterson reviewed Reynolds for her mid-year 2011 evaluation, giving her an overall rating of 3 out of 4. He noted that she had done a "good job with getting back to the basics;" but she should be sure she didn't have any "low performers ... I know you've removed some, but we must remove all. You have been there long enough to know the people that are going to grow with you and the people who are not." (Doc. 38-15, Ex. N at 2)[8] Patterson summarized her anonymous "Shopper Review" results for the year to date; her overall results were 77.8% "Great," 13.2% "OK," and 9.0% "Nope," which did not meet Chipotle's goal (87% great, 9% OK, 4% nope). Patterson told Reynolds that the "expectation of new General Managers is becoming restaurateur in

---

[8] Patterson used the same verbiage in Stephanie Ochoa's mid-2011 review.

[as] little as 6 to 8 months into the role, and current General Managers should [be] near

that now." He reminded her of the three "pillars" of Restaurateur promotion: having "top

performers," "high standards," and "empowerment" of her team. Prior to this review,

Reynolds understood that General Managers could choose to seek promotion to

Restaurateur but were not required to do so, and could opt to remain as the General

Manager of one restaurant. She thought the new "up or out" expectation was a big

change. (Doc. 68, T. Reynolds Dep. at 246)

Reynolds had a series of TL audits at her restaurant during 2011. (Doc. 38-16 to

38-20, Exs. O through S) Coran Stetter (a male General Manager) audited on February

18, giving her an operations score of C-77, and cash handling score of 1. Luis Martinez

audited her restaurant on March 30, giving her an operations score of B-88 and cash

handling score of 1; Martinez stated that he "loved the customer service" during his visit.

(Doc. 38-17 at 1) Cris Reynolds audited on May 12, resulting in an operations score of

B-81, and a perfect cash handling score of 0. In her audit comments, she urged Tina to

stop thinking about "the remodel [of her restaurant] and just concentrate on what she

can control." She stated that "overall there has been tremendous improvement in

Western Hills." (Doc. 38-18, Ex. Q at 1) Coran Stetter audited again on June 30, and

gave an operations score of C-74 and a perfect cash handling score of 0. He noted that

operations have "really improved," but that the location was 9 years old "and needs a lot

of love on the facilities side that Tina and team can't really do much about without the

support from their [facilities] team. Especially the hot [food] well not reaching

temperature." (Doc. 38-19, Ex. R at 1) Andy Ransick audited the restaurant on August

8, scoring operations at B-87 and a perfect cash handling score of 0. He noted that he

-37-

and Reynolds spent some time organizing and "decluttering," but that her team "stayed on task and had high energy throughout the entire shift."  (Doc. 38-20, Ex. S at 1)

On September 15, 2011, Jennifer Clarke, accompanied by Herman Mobbs, conducted an SSR audit.  Clarke's written summary begins by stating that the restaurant's operations "are an insult to our brand."  Cleanliness has sunk "to an unimaginable low.  The first thing we noticed when we walked into the [back] was a stench that seemed to come from underneath a platform in the prep area ...  After the smell, we noticed that the back of this restaurant is not being taken care of by our team - the place is filthy. ... Tina, GM, was here today but only temporarily because as she mentioned at least three times, this was her day off.  She was only there because this was the last day to complete the restaurant cash review."  Clarke noted that Mobbs (as the new Area Manager) "just inherited Western Hills a couple of days ago and this was his first visit to the restaurant.  He realizes the gravity of the situation here and has said he will ensure that necessary changes are made in order [to] turn things around."  (Doc. 38-21, Ex. T at 1)  Clarke and Mobbs scored operations at D-61, and her cash handling score was 9.  Unlike the previous TL audits, Clarke found several violations of the cash handling policy.  She also observed that the cash drawers were broken, and the lock boxes were not bolted down.  Clarke blamed Reynolds for not following up on these two critical items.

Reynolds doesn't substantially disagree with many of the observations recorded by Clarke and Mobbs during this audit about the state of the restaurant, but she rejects Clarke's description of the restaurant as "filthy."  She testified that her staff told her that Clarke was rude to them during the audit visit.  She accuses Clarke and/or Mobbs of

-38-

deliberately sabotaging her cash handling audit by hiding a number of cash slips in an empty potato chip bag, which Reynolds found later that evening pushed behind a computer.  She has no evidence that either Clarke or Mobbs actually concealed these documents, but argues that "someone" must have done so because the cash slips that were noted as missing during Clarke's audit were found in the bag.  Reynolds also rejects any responsibility for problems related to the age and condition of the physical facilities of her restaurant, because Patterson had denied her requests for new equipment and repairs.  (Doc. 68, T. Reynolds Dep. at 285-286)  Reynolds applied for a job at Panera Bread on September 26, about ten days after the SSR audit.  (Id., T. Reynolds Dep. Ex. 48)

Mobbs performed a TL audit at Reynolds' restaurant on September 29, two weeks after the SSR audit.  He testified that he decided to visit the restaurant at dinner time, and observed such poor operations that he stayed until 9:30 that evening to assist the crew.  (Doc. 63, Mobbs Dep. at 99)  His operations score was D-62, and the cash handling score was 3.  He wrote that this visit "was somewhat better" than the SSR visit two weeks earlier, and the stench in the kitchen had been eliminated.  Cash handling had drastically improved, and Mobbs offered his congratulations on that issue to Reynolds and her team. But most of the operational problems he saw that night were avoidable ones, and some had been observed during the SSR audit.  (Doc. 38-22, Ex. U)  Mobbs sent an email to Reynolds on either September 30 or October 1, outlining his concerns about the restaurant and asking her to develop a plan to remedy the problems encountered the evening of the audit, which included running out of food and being so understaffed that customers were kept waiting.  Reynolds responded on October 1, and

offered explanations of why some of these problems occurred. (Doc. 38-23, Ex. V) Mobbs' reply strongly suggests that he did not accept her explanations.

Mobbs then sent an email to Patterson, stating: "As much as I would like to mentor Tina to get through this moment, I do not believe she is capable of taking herself or the team to the level we need them. No one there seems to be leader. She is still full of excuses and the excuses are not even valid. ... Based on the condition of the restaurant Thursday and the dinner shift, her response to my e-mail and the last two audits, I can't see her continuing to lead Western Hills. I am of the opinion we should remove her." (Doc. 63, Mobbs Dep. Ex. 6) Patterson replied that he was "OK" with Mobbs' decision, and they exchanged ideas about who could replace her.

Michelle Small never visited Reynolds' Western Hills restaurant. Small states in her declaration that when she saw the results of the September 15 SSR audit, she told Patterson that "we had to be swift in removing people who cannot create a restaurant culture, specifically Tina Reynolds." (Doc. 38-2, Ex. A at ¶20) In her deposition, Small could not recall if she was specifically consulted by Patterson or Mobbs about the decision to terminate Reynolds. She said that termination decisions are based on several factors, and while Reynolds' SSR audit result was terrible, "it's not the only thing that we look at when we terminate somebody." (Doc. 82, Small Dep. at 111-112)

Mobbs terminated Reynolds on October 3, 2011 after a group managers' meeting. (The parties refer to these group manager meetings as "patch" meetings.) During that meeting, Reynolds volunteered to answer a question that Mobbs posed to the group, but Mobbs said, "Let's hear from somebody else." Mobbs pointed at Luis Martinez, and asked him to answer the question. Reynolds cited this as an illustration

of how Mobbs favored male managers over female managers. At the end of the meeting, Mobbs pulled her aside and told her she was being fired. Kevin Male was there during the conversation but he did not say anything. Cole Hundley replaced Reynolds as General Manager at Western Hills. Hundley, whose birth name is Nicole, is transgender and identifies as a male. Mobbs testified that he thought Hundley identified herself as a lesbian, but he had never discussed her sexual orientation with her. (Doc. 63, Mobbs Dep. at 114)

Chipotle contends that Reynolds cannot establish a prima facie case, because her inadequate performance shows that she was not qualified for her job. The Court noted previously that it may not consider the employer's explanation of its adverse action at the prima facie stage to determine if a plaintiff is objectively qualified. Wexler v. White's Fine Furniture, 317 F.3d at 574-575. Chipotle promoted Reynolds to General Manager in July 2010, and transferred her to a facility in very poor condition that Chipotle wanted to improve. It reasonable to assume that Chipotle believed she was objectively qualified to perform that job. While Chipotle argues that her performance declined, the record documenting her performance prior to the September 15, 2011 SSR audit does not support Chipotle's contention that she was **objectively** unqualified to be a General Manager.

Chipotle also contends that Reynolds was replaced by a woman, and she has not shown that similarly-situated males were treated more favorably. Reynolds responds that Hundley self-identified as a male and should be treated as such for purposes of the prima facie claim. She also argues that Mobbs treated her less favorably because he conducted more frequent audits at her restaurant than at

restaurants managed by males.  TL audits are supposed to be done at each restaurant every 45 days.  (Doc. 38-1, Ex. A at ¶17)  Mobbs' September 29 TL audit was two weeks after the SSR audit, which are done approximately once a year.  Prior to the SSR audit, Reynolds' most recent TL audit was on August 9; Mobbs' September 29 audit was approximately 45 days later.  The record also reflects the fact that co-plaintiff Cris Reynolds had regular TL audits while she was working toward promotion to RT; at one point, she was audited twice within 21 days.  Meghan Verplank had TL audits on June 30 and July 16, 2010, both times by co-plaintiff Jennifer Hernandez.  Tina Reynolds also argues that after she was terminated, Mobbs conducted fewer audits on Rigoberto Vicente, the male manager at Western Hills (who replaced Cole Hundley,  Reynolds' immediate replacement).  She submits copies of audit reports for Western Hills showing that Vicente was audited on May 21, August 2, and November 10, 2012 (TL audits), more than 45 days apart.  This pattern of audit frequency does not vary so substantially from audits performed by others that the Court could conclude that Mobbs treated similarly-situated male managers differently regarding audit **frequency**.

Reynolds alternatively contends that her audit scores were comparable to or better than other male General Managers who were not fired or disciplined.  John Curran was the apprentice manager at the new Kings Island restaurant, and Mobbs first audited him on September 20, 2011.  His next audit was on November 9, 2011, resulting in an operations score of D-65 and a cash handling score of 11.  Mobbs commented on this unacceptable result, but noted that Curran was an apprentice and was training other management staff.  Mobbs's report stated that he intended to conduct another surprise audit later that month, but there is no evidence in the record that he did

so. The next audit report for Curran is dated February 7, 2012, when his operations score was D-67 (and Mobbs did not record a cash handling score). Despite these negative results, Mobbs believed that Curran would become a Restaurateur, because he "is passionate and enthusiastic about Chipotle." (Doc. 79-13, Ex. 15-22) Curran's next audit was March 31, 2012, when Mobbs gave an operations score of B-80 and cash handling score of 5. Curran was apparently promoted to General Manager before his next TL audit on July 27, when Mobbs scored operations at D-62, and his cash handling score was 5. Curran had an SSR audit by Jennifer Clarke on August 28, 2012, in which she scored his operations at C-77, and 4 on cash handling. (Doc. 79-13, Ex. 15-31) Curran was not terminated.

Chipotle responds that Plaintiffs' reliance on other audit scores is misplaced, because they do not include all the audits at these other restaurant locations. Chipotle does not offer any additional audits for these managers, or state specifically which male managers had additional audits that are not identified in Plaintiffs' brief. Chipotle repeatedly argues that its TL and SSR audits are based on objective criteria applied equally to all managers. Comparing the treatment of male and female Cincinnati-area managers based on their audit results would therefore appear to the Court be a reasonably objective comparison. Since Reynolds' prima facie burden is not an onerous one, the Court finds that Reynolds has shown a disparity between Mobbs' decision to fire her but not the male general managers such as Curran who received comparable or worse audit scores.

Chipotle claims it terminated Reynolds due to her declining performance and the unacceptable operations in her restaurant. Reynolds argues that these reasons are

pretext. Mobbs first visited her restaurant with Jennifer Clarke when they conducted the September 15 SSR audit. The scores from that audit were significantly worse than her most recent audit only a few weeks prior. Reynolds suggests that Mobbs unfairly influenced the SSR audit results; but Clarke testified that she and Mobbs performed the audit together by walking around the restaurant and discussing each section of operations. The audit scores were based on their application of Chipotle's high standards, and she did not recall having any disagreement with Mobbs. Clarke had not met Mobbs before this audit, but she "thought that he knew the high standards, and I thought his communication to the people in the restaurants was direct and clear." (Doc. 49, Clarke Dep. Vol. 1 at 14-15) Mobbs testified that with respect to all of his audit visits, he was "more critical in general because I want the [restaurant] team to get better ...", not that he was more critical of Reynolds than was Clarke during this specific audit. (Doc. 63, Mobbs Dep. at 94)

Reynolds also contends that the unacceptable cash handling score was not her fault, because someone put cash slips in a potato chip bag and hid them behind a computer. These documents were marked as missing on the SSR audit, which contributed to the failing score. Michelle Small admitted that if she had learned that a failing score was caused by hidden documents, she would be concerned and would want to investigate who did that and why. (Doc. 82, Small Dep. at 99-100). Reynolds accuses Clarke and Mobbs of deliberately hiding these documents, but she has no evidence that they did so. She could not be certain if she told Brian Patterson about discovering this hidden bag, but she concedes that she did not call Chipotle's HR group to report this incident. She said she was "shocked and bewildered" by the whole

situation.  (Doc. 68, T. Reynolds Dep. at 296-297)

Reynolds also argues that she had no control over the low scores attributable to the poor physical condition of her restaurant, because she did not have authority to get those problems fixed.  She needed approval from Patterson and/or Chipotle's facilities team (Andy Bender) for any physical plant repairs or improvements.  The "stench" that Clarke noted in the kitchen was due to a malfunctioning grease trap that was supposed to be serviced by a contractor, and Reynolds was not allowed to call for service without approval.  Reynolds repeatedly asked Patterson to approve repairs and to purchase new equipment, and he denied her requests.  Andy Bender, who was in charge of physical facilities for Chipotle, visited Reynolds' restaurant on August 5, 2011, six weeks before the SSR audit.  Bender reported to Patterson that he had a "great day," that he was "becoming a fan of the store and the new crew," and that the store was steadily improving in all areas of facilities.  (Doc. 76, Patterson Dep. Ex. 21)  After the SSR audit, Small asked Bender about the facilities issues noted in the audit report; Bender responded to Small that some of the items were new issues.  But he reminded Small that Western Hills "... is in need of more remodeling and has for a while.  The bathrooms are terrible the dining room walls need something done.  The new floor that we had put down is now peeling up ... .  I know with the type of [SSR] review they received it looks dismal, but I did see improvement on the things they could control ...".  (Doc. 76, Patterson Dep. Ex. 22)  Despite Bender's statements, Small believed that Reynolds was responsible for the decline in the facilities that Clarke observed during her September 15 audit.

While Reynolds may not have been responsible for all of the facility problems in

her restaurant, she does not deny Mobbs' factual observations about the restaurant's operations during his September 29 TL audit. Specifically, the restaurant was short-staffed and the crew ran out of food. When Mobbs questioned her about his visit, she did not deny these conditions but attempted to explain why they happened. Mobbs and Patterson found her explanations to be insufficient. Her disagreement with their reaction to her explanation does not suffice to create a genuine dispute about pretext. See, e.g., LeFevers v. GAF Fiberglass Corp., 667 F.3d 721, 725-726 (6th Cir. 2012)(plaintiff's disagreement with his employer's evaluation of his performance does not render the employer's reasons pretextual). This is particularly true for decisions about management positions, for which the courts should accord much greater flexibility to employers. Browning v. Dept. of the Army, 436 F.3d 692, 698 (6th Cir. 2006).

Reynolds also argues that she has established a genuine dispute that Chipotle's explanation was insufficient to motivate her discharge, because male managers who received similar audit results were not terminated. As noted above, Christian Armenta (General Manager at the Kenwood Road restaurant) received TL audit scores on September 30 and December 30, 2011 of D-67/5 and D-69/4, respectively, and his March 31, 2012 audit score was 71/5. His SSR audit score on August 21, 2012 was D-62/5. The operations were so bad that at one point Small closed his restaurant, and Ransick described it as a "fiasco." (Doc. 66, Ransick Dep. at 110-111) Armenta was not terminated despite this record of low audit scores over a year-long period. Jose Garduno became a General Manager on March 6, 2012; his TL audit scores in 2012 were D-69/6, D-69/9, C-73/4, C-75/2, C-75/6, and C-75/5. He was not terminated, and he voluntarily left Chipotle in January 2014. Scott Phillippo (Fountain Square GM)

-46-

received audit scores of C-76/1 on August 14, 2011; C-74/5 on August 3, 2012; and D-69/5 on June 29, 2013.  Even though he had almost two years tenure at that point, the auditor wrote in the report that Phillippo was "not yet" at the Restaurateur level. Phillippo was not terminated.

Chipotle does not dispute Reynolds' description of the condition of the Western Hills facility when she first arrived.  Nor does it dispute Reynolds' contention (which is supported by Bender's statements in his emails to Patterson and to Small) that she lacked authority to order additional needed repairs to the restaurant's physical plant, or to have a contractor come and repair the grease trap in the kitchen.  This was apparently repaired sometime between the SSR audit on September 15 and Mobbs' next visit on September 29, strongly suggesting that someone finally addressed a problem she was not allowed to resolve but for which she was blamed.

Based on all of these circumstances, the Court must conclude that Reynolds has established a genuine factual dispute whether the cited reason for her termination was sufficient to justify that decision.  Chipotle's motion for summary judgment on Tina Reynolds' claims is denied.

4.    **Elizabeth Rogers** began her employment with Chipotle in April 2004.  Alan Clark was her Area Manager at that time, and he promoted her to General Manager of the Buttermilk Pike, Kentucky restaurant in October 2008.  Clark completed her review for calendar year 2009, rating her overall performance at 2 out of 4.  Clark noted that Rogers had done many things "... to create a restaurateur culture in her restaurant. ... [Rogers] has developed a track record of being able to hire develop and promote future leaders for Chipotle. ... [She] just needs to tweak her crew a little to get them ready for

restaurateur level." (Doc. 69, Rogers Dep. Ex. 18) Alan Clark remained her Area Manager until January 2011, and he completed her review for calendar year 2010. (Doc. 39-13, Ex. L) Clark noted in that review that at the year's start, Rogers had been reluctant to remove some low-performing employees but that she eventually did so. By year's end, she was "close to being ready for a [Restaurateur] visit." Clark rated her 2010 overall performance slightly below the prior year, at 3 out of 4. (Id. at 5) After Alan Clark was demoted in early 2011, Brian Patterson became Rogers' Area Manager and direct supervisor.

William Whitworth (a former General Manager) conducted a TL audit on February 13, 2011, and gave Rogers an operations score of B-83, and a cash handling score of 4. (Doc. 69, Rogers Dep. Ex. 21) Whitworth did another TL audit on March 31, 2011, scoring operations at C-77 and 2 for cash handling. He noted in his summary that there was a "great feel in the restaurant. Busy lunch warm crew." (Id., Rogers Dep. Ex. 22)

Rogers was pregnant with twins in the spring of 2011, and in April her physician suddenly put her on bed rest. She requested and was granted FMLA leave, approved to start on May 5 for twelve weeks. On May 14, 2011, shortly after Rogers began her leave, Coran Stetter conducted a TL audit at her restaurant. He gave an operations score of B-85 and a cash handling score of 2. He summarized his visit by stating that "Operations are strong at Buttermilk ...". He noted that the restaurant was short-staffed but they were working to hire more people. (Doc. 39-15, Ex. N)

Rogers' twins were born prematurely at the end of May. One of them unfortunately died within hours; the surviving twin remained in the hospital for over 100 days. While she was on leave in July, her brother-in-law suddenly died. On July 17,

-48-

Rogers called Patterson and told him she was not ready to return full-time. She and Patterson agreed that she could work a part-time schedule. About a week later, however, Patterson called Rogers again and told her she could not work part-time and would have to return to her regular full-time job when her doctor released her. Despite her misgivings, Rogers did so on August 2, 2011.

Herman Mobbs was training to become an Area Manager in the summer of 2011, and he covered for Rogers while she was on leave. Mobbs formally became her supervisor in August 2011 when she returned. Mobbs asserts that when he first arrived, the restaurant was not very clean and was "operationally challenged." (Doc. 63, Mobbs Dep. at 24) Rogers' first day back at work was August 2, 2011, and Mobbs told her that he would help her return and ease back into working. Despite that assurance, Mobbs insisted that she work a full-time schedule that week, even though he was already scheduled to work. Alan Clark did a TL audit of the restaurant on August 11, 2011, nine days after Rogers returned. Clark gave her an operations score of B-87, and a cash handling score of 7. In summarizing the cash handling section, Clark noted that the "DCRs [daily cash reports] were complete but the fact that no audits were done in July caused such a high score." (Doc. 69, Rogers Dep. Ex. 24) Six of the seven points were due to the lack of manager cash reviews in July, the month when Rogers was on FMLA leave and Mobbs was covering her restaurant.

Jennifer Clarke conducted an SSR audit at Rogers' restaurant on September 13, 2011. Clarke gave her an operations score of B-80 and a cash handling score of 4. Three of the four cash handling points were due to occurrences during Rogers' first two weeks back at work. Clarke noted in her summary that the "cash handling here is

actually very good.  Unfortunately, there was no cash review done during the first half of August which resulted in 3 of their LP points.  The cashier packets were extremely organized and well documented."  Clarke stated that the team "has a few operational challenges that they need to address," and that Rogers' restaurant was "not a Restaurateur restaurant yet.  I met some super friendly folks like Evelyn, Service Manager, but I also was able to identify at least 3 people that I would not consider to be high performers."  (Doc. 39-27, Ex. V)

Mobbs did a TL audit two weeks later, on September 30.  He gave Rogers an operations score of D-64, and a cash handling score of 1.  (Doc. 39-30, Ex. X)  Mobbs noted that while his overall visit was "okay," he was "... especially critical of the team in an effort to raise the bar in this high-volume restaurant. ... Continue to focus on the details and hold your team accountable for producing a great result."  Rogers testified that Mobbs ignored her and did not speak to her at all during this audit.  At a managers meeting a few days later, Rogers asked Mobbs why he did not talk to her during his audit visit; Mobbs responded that it was "her problem."  Rogers then told Mobbs that she felt she could not talk to him because he always got mad at her when she did.  Mobbs responded, "you are a mess.  Every time I see you, you're a mess."  (Doc. 69, Rogers Dep. at 88, 89-91)  Shortly after this encounter, Mobbs held another patch meeting and ignored Rogers.  Mobbs made comments about overweight women managers, about his intolerance for crying, and that many female employees cried too much.  Mobbs told the group that males (particularly Luis Martinez and Coran Stetter) were going to get more of his time because "they devoted more time to Chipotle by placing Chipotle as number one over everything else.  [Mobbs] was constantly talking

about bringing a male in to replace [Rogers'] female assistant manager because 'we had too much estrogen in our restaurant.'"  (Doc. 39-34, Ex. BB, Rogers' Suppl. Response to Interrogatory No. 3.)

Andy Ransick, a Restaurateur, knew Rogers when she began working at Chipotle, and he helped her move up in the company.  He never visited the Buttermilk Pike restaurant, but he was back in Cincinnati by the summer of 2011 and he spoke with Rogers almost weekly after Mobbs became her Area Manager in August.  Rogers told Ransick that Mobbs was "degrading" in his approach to her.  Rogers called Ransick one day, crying and telling Ransick that Mobbs "... made a very inappropriate comment that basically said she looked like a wreck and [was not] going on with her life and [had] no compassion with her as a person [sic].  Just more or less, you know, you need to wipe your smile back on and move forward."  (Doc. 66, Ransick Dep. at 106)  Ransick believed that Rogers felt demeaned by Mobbs.  (Id. at 108)  Alan Clark and Steven Botts, a former Restaurateur whom Mobbs terminated in 2012, both thought that Mobbs was rude and disrespectful.  (Doc. 58, Clark Dep. at 76, 79; Doc. 48, Botts Dep. at 28-29.)

On November 5, Mobbs told Rogers that her restaurant was understaffed, even though Rogers had hired several new employees since she returned from FMLA leave. On November 8, Mobbs issued her a written warning documenting this discussion, stating that customer experience was being jeopardized by her lack of "Top Performers."  (Doc. 39-31, Ex. Y)  Eight days later, on November 16, Mobbs terminated Rogers.  He came to her restaurant after a managers meeting, called her into the office, and told her they were "parting ways" because her hiring plan "was not textured

enough." (Doc. 69, Rogers Dep. at 95-96) Candace Andreoni, Chipotle's HR "people support consultant," testified that Mobbs told her that he terminated Rogers because she "was emotional," she "wasn't back to work," and she was "not in the right mindset" to be at work. Andreoni contacted the benefits department to investigate employment alternatives for Rogers short of termination, but she could not recall what, if anything, may have been available. Andreoni did not recall discussing the possibility of a part time position, and she did not attempt to verify Mobbs' description of Rogers' performance. (Doc. 47, Andreoni Dep. at 40-42) Mobbs testified that he terminated Rogers because she had not fixed the staffing issues in her restaurant, and because he saw employees listed on her schedule that were no longer working for Chipotle. Mobbs said that Patterson was aware of these problems, and that he agreed with Mobbs' decision. (Doc. 63, Mobbs Dep. at 37-40) Patterson testified that Mobbs made the decision to terminate Rogers, that Mobbs talked to him about it, and he said "okay." All he could recall about the reason Mobbs gave was "performance deficiencies." He did not look at Rogers' audit scores before giving his "okay." (Doc. 65, Patterson Dep. Vol. I at 255-257)

Rogers asserts claims for FMLA retaliation and for sex discrimination. A prima facie case of FMLA retaliation requires her to show: (1) she engaged in protected activity, exercising her FMLA rights; (2) Chipotle knew of that exercise; (3) she suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir. 2012). Chipotle disputes the fourth factor, arguing that she has no evidence of a causal connection between her leave and her termination.

Rogers responds that she is relying on the temporal proximity of the two events, which gives rise to a plausible inference of a causal link.  She returned from FMLA leave on August 2, and was terminated three months later.

There is no specific length of time that will establish a causal link in all cases.  See, e.g., Singfield v. Akron Metro Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004)(three months proximity is enough to demonstrate a causal connection); Dage v. Time Warner, 395 F.Supp.2d 668, 677 (S.D. Ohio 2005)(two month period between FMLA leave and termination is sufficient to raise a reasonable inference of causation); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007)(three months was sufficient); Gambill v. Duke Energy Corp., 456 Fed. Appx. 578, 589 (6th Cir. 2012)(collecting cases and finding that a two-year gap did not establish a causal link, but a gap of "a matter of months" may be sufficient); Seeger v. Cincinnati Bell, 681 F.3d at 283-284 (two-month gap between notice of plaintiff's medical leave and his termination was sufficient).  In  Vereecke v. Huron Valley School Dist., 609 F.3d 392 (6th Cir. 2010), the Sixth Circuit emphasized the importance of a case-by-case analysis of the facts:

> In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn.  At this point, our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference. ... Indeed, we have rarely found a retaliatory motive based only on temporal proximity.  Even in Mickey [v. Zeidler Tool & Die Co., 516 F.3d 516 (6th Cir. 2008)], where we articulated the principle that temporal proximity could hypothetically be sufficient in a given case, we noted the presence of additional evidence.

Id. at 400-401 (internal citations omitted).

The "totality of the circumstances" presented here, combined with the temporal proximity between her FMLA leave and her termination, are sufficient to satisfy Rogers' prima facie burden. She argues that Mobbs increased his scrutiny of her immediately upon her return from leave. His particularly critical TL audit was only 17 days after her relatively successful SSR audit by Jennifer Clarke. Rogers received an operations score of 87 on her August 11, 2011 TL audit, which was only ten days after she returned to work. Chipotle contends that it is illogical to argue that Mobbs "increased" his scrutiny of Rogers after her leave, because he was not her actual supervisor until she returned. Mobbs covered for Rogers while she was on leave, and he testified that from the outset he believed her restaurant was "operationally challenged." Moreover, Mobbs knew the reason that Rogers was on leave, and it is not illogical to suggest that he "increased" his scrutiny of her when she actually returned to work. And Mobbs told Rogers at a meeting shortly after her return that she was a "mess," and "everytime I see you, you're a mess." Mobbs told Andreoni that Rogers was "too emotional" to do her job. These comments could be interpreted to refer to her FMLA leave, which she took to deal with a difficult pregnancy and the loss of a newborn child. A plaintiff's prima facie burden of proof is not intended to be onerous, and Rogers has satisfied it.

Chipotle also contends that Rogers has not established a prima facie discrimination claim. After she was terminated, her duties were initially assumed by a female apprentice manager, Aracely Mendez, until a new female General Manager, Kerstina Caggiano, was hired to replace Rogers. Rogers argues that male General Managers were treated more favorably, and were not disciplined or terminated despite

receiving worse audit scores.  In an interrogatory response, Chipotle states that after

the September 30, 2011 TL audit, "Mobbs gave Ms. Rogers a month to improve her

performance after her low audit score, but she did not.  Mobbs terminated Ms. Rogers

for unacceptable work performance on November 16, 2011."  (Doc. 79-1, Ex. 1 at p. 84)

Chipotle claims that her unacceptable work performance included, but was not limited

to, "her failure to identify and take appropriate actions with low performers in her store

(e.g., failing to create a culture of top performers), failure to meet the high standards of

empowerment and a Restaurateur culture, and receiving a low rating on a Team Lead

Audit."  (Doc. 79-1, Ex. 1 at p. 85)  Rogers cites evidence that male General Managers

who received comparable audit scores were not fired within weeks of one unacceptable

audit.  And male managers, particularly Luis Martinez and Scott Phillippo, were given

more time to achieve promotion to Restaurateur.  Martinez became a General Manager

on December 9, 2009, and was promoted to RT on February 20, 2013, 17 months after

the new timeline for promotion was established.  Scott Phillippo became a GM on April

11, 2011, and has not been promoted to RT but remains employed with Chipotle.

"Similarly situated" does not mean "identically situated."  The Court finds that Rogers

has established a prima facie gender discrimination claim.

The same analysis applies to an employer's explanation for the adverse action

and the question of pretext for purposes of Rogers' FMLA retaliation claim and her

discrimination claims.  Chipotle contends that Rogers failed to hire enough employees

who were "top performers" even though Mobbs warned her of the need to do so.  It

claims that Rogers hired ten new employees after she returned from leave, but 12

employees left in that same period.  (See Doc. 39-1 at 13, n.1, citing the restaurant's

weekly schedules attached to Chipotle's motion as Exhibit Z.) Mobbs told Rogers that she was being terminated because her hiring plan was not "textual" enough, after giving her a written warning eight days before, and despite the fact that she hired three new employees who were scheduled to start work the next day. Mobbs did not mention her audit score. Mobbs told Andreoni that he was terminating Rogers because she "was emotional" and "not in the right mindset" to be working. Patterson could not recall any specific reasons Mobbs gave him for his decision to fire Rogers. (Doc. 65, Patterson Dep. Vol. I at 255) Rogers argues that these various explanations create a genuine dispute about Chipotle's stated explanation for firing her.

In May v. Pilot Travel Ctrs. LLC, 2007 U.S. Dist. LEXIS 484 (S.D. Ohio 2007), the court denied an employer's summary judgment motion after finding that varying explanations it gave for firing the plaintiff raised a genuine dispute on pretext. The court cited a Third Circuit decision explaining why this is appropriate in certain cases:

> We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

Id. at *18, quoting Fuentes v. Perskie, 32 F.3d 759, 764-65 n.7 (3d Cir. 1994). Chipotle argues that its explanations have not varied, and that it has simply offered additional consistent, non-discriminatory reasons for Rogers' discharge. It cites MacDonald-Bass v. J.E. Johnson Contracting, Inc., 493 Fed. Appx. 718, 726 (6th Cir. 2012), where the

Sixth Circuit noted that the employer's reasons for firing the plaintiff were not incompatible, and could not be fairly described as "shifting."  But in that case, the initial reason offered for terminating plaintiff was that she was physically unable to perform all of her duties as an apprentice pipefitter.  Later on, the employer claimed that her difficulties were partly due to her physical limitations and partly due to her difficulty in retaining material she had been taught about the proper use of tools and equipment.  These performance issues were substantially interrelated, and were supported by testimony from her co-workers.  Here, in contrast, Mobbs offered different explanations to Rogers and to Andreoni at the time he decided to fire Rogers; and unlike the situation in MacDonald-Bass, there is scant evidence that any other Chipotle personnel shared Mobbs' opinion of Rogers.  Chipotle cites her deposition testimony admitting that she had "issues" with staffing or maintaining cleanliness on certain occasions.  But having "issues" on certain occasions is not tantamount to an admission that her performance warranted termination.

The Court finds that Chipotle is not entitled to summary judgment on any of Rogers' claims.  The treatment of male General Managers with audit scores comparable or worse than Rogers' scores; the content of Mobbs' critical TL audit, compared with Rogers' most recent SSR audit; Mobbs' comments to her about her "emotional" state, that she was a "mess," that she should replace her female apprentice with a male, and that there was "too much estrogen" in her restaurant; and the consistently more favorable appraisals of Rogers' operations by other Chipotle personnel, constitute a sufficient body of circumstantial evidence to raise a genuine dispute as to whether Chipotle's articulated reason for her termination is a pretext for either gender

discrimination or FMLA retaliation.  Chipotle's motion for summary judgment with respect to Rogers' claims is therefore denied.

5.      **Meghan Verplank** was first hired by Chipotle in March 2005 as a kitchen crew employee.  She was promoted several times through the ranks, and on January 5, 2009, Cris Reynolds and Morshed Chowdhury (former Cincinnati area Team Director) promoted her to General Manager of the Tylersville Road restaurant.  Cris Reynolds completed Verplank's first General Manager's yearly review for calendar year 2009. Verplank was rated overall as a 3 out of 4; Reynolds noted that Verplank "made tremendous strides in improving the organization and operations at Tylersville. ... She needs to focus on empowering her management team to make decisions and solve problems on their own."  (Doc. 40-12, Ex. K)

        Cris Reynolds reviewed Verplank's performance again for calendar year 2010, and again rated her overall performance at 3 out of 4.  Reynolds noted that Verplank trained and developed some crew employees into managers, but she did not maintain employee development journals: "She has to stop making excuses for not executing basic GM expectations because of her team.  A [Restaurateur] culture is one that produces without excuses." [9]  Reynolds told Verplank that she needed to adopt and impose higher standards, and to hold her team more accountable.  In her self-critique, Verplank admitted that she needed to raise her standards in order to be promoted.  She also admitted that her restaurant needed a lot of detail cleaning, and that her assistant

_____

[9] General Managers are responsible for regular "development journal" conversations with their employees.  One of the key job responsibilities listed on the managers' performance review form is documenting and following up on these discussions with their employees.

managers were not "on the same page." (Doc. 40-13, Ex. L)  After Cris Reynolds was

demoted in January 2011, Brian Patterson became Verplank's team director.  Kevin

Male recalled visiting Verplank's restaurant once after Patterson arrived but he did not

remember the reason for his visit.  He recalled that the food quality "wasn't that great,"

and the "restaurant was filthy."  (Doc. 62, Male Dep. at 172-173)  He told Patterson

about his visit and these observations.

The record includes several audit reports for the Tylersville restaurant.  Jennifer

Hernandez (f/k/a Yacuzzi) conducted a TL audit on June 30, 2010, and gave Verplank

an operations grade of C-75, and a failing cash handling score of 10.  Hernandez noted

that cash handling was a "big issue that needs to be addressed immediately. ... Overall

cleanliness was OKAY."  (Doc. 40-14, Ex. M at 1; emphasis in original.)  Hernandez

audited the restaurant again on July 16, giving Verplank an operations grade of C-78,

and a cash handling score of 1.  This time, Hernandez wrote that cash handling

procedures were "very organized," but the restaurant needed improvements in

organization and cleanliness.  (Doc. 40-15, Ex. N)  Kristina Vargas conducted a TL audit

on December 20, 2010; she gave an operations score of A-93, and a cash handling

score of 4.  Vargas noted that "overall the food looked great."  (Doc. 40-16, Ex. O)

Vargas did another TL audit on January 19, 2011, resulting in an operations grade of B-

88, and a perfect cash handling score of 0.  Doc. 40-17, Ex. P)  Stephanie Ochoa did a

TL audit on February 14, 2011, giving an operations score of B-86, and cash handling

score of 1.  (Doc. 40-18, Ex. Q)  Cris Reynolds conducted a cash audit only on June 30,

2011, resulting in a score of 2.  Reynolds noted that the cash handling records "were

extremely neat and organized.  Much improved since I was Direct Report manager for

Tylersville. Team seemed upbeat and restaurant was very busy." (Doc. 40-19, Ex. R) Verplank was not on duty the day of this audit.

On July 19, 2011, Tim Spong conducted an SSR audit at Verplank's restaurant. Spong gave her an operations grade of F-59, and a cash handling score of 6. Spong commented that operations at the restaurant

> ... were very poor, starting with extremely bad deployment ... Our apprentice and service manager were in the back of the house, in the office, working on development journals and doing prep, when we had a 7 [customer] deep line. The service here is very poor ... This poor deployment carried on throughout the 2+ hours that I was in the restaurant. Lots of standing around and little 'clean as you go' happening here. The floors in the dining room were trashed, the prep was very poor and inconsistent, ... and the front and back of the house not clean.

(Doc. 40-23, Ex. V) Verplank was not working the day that Spong conducted this audit, but some of the cash handling deficiencies he documented occurred on days that she had worked. Verplank was afraid she would be fired due to this audit, because Patterson did not communicate with her afterwards about how to fix the problems Spong observed. (Doc. 70, Verplank Dep. at 55-56 ) She met with her managers who were on duty that day (Angel Gonzales and Omar Gutierrez), and told them they should know how to operate the restaurant when she was not there. Verplank wanted to fire Gonzales, but Patterson disagreed. (Id. at 197-200)

Michelle Small received Spong's SSR audit report later that day, and she immediately sent an email to Patterson saying "terminate her on this" (meaning terminate Verplank). (Doc. 78, Small Dep. Ex. 17) Small testified that a score of "F" on an SSR audit was rare: "... maybe we've gotten ten F's out of 400 restaurants in the last couple of years. So, one, absolutely that's why I'm jumping on it within minutes of it

coming across my desk." She expected that the entire restaurant team was "spoken to" about the condition of the restaurant, because it is "deplorable to get to an F." (Doc. 82, Small Dep. at 157-158) While Small could not be certain that every General Manager who received an F on an SSR audit was fired, she thought it likely that "somebody in each of those restaurants was removed...". (Id. at 162)

Patterson testified that Spong called him later the day of the SSR audit, saying "... you've got to get in here, this place is a disaster, someone's got to get in here." (Doc. 65, Patterson Dep. Vol. I at 263-264) Patterson and Ransick went to Tylersville later that day and found conditions were unacceptable; he described the restaurant as "[d]irty. Running out of food. Not enough people to handle the volume of sales." (Id.) Patterson decided to terminate Verplank a few days later. Patterson explained that Verplank "was a general manager for an extended period. [Small] was not happy about the SSR audit and said how much time are we going to give her, and it's time for her to be removed. This is just a constant track record of under-performing operationally." (Id. at 271) Verplank's termination form cites her unacceptable performance, and that she is not eligible for rehire. (Doc. 40-29, Ex. AA)

Chipotle contends that Verplank has not established a prima facie discrimination claim because she was replaced by a female, and she has not identified any similarly situated males who were treated more favorably. Verplank contends that Patterson offered her job to Omar Gutierrez (the apprentice manager who was on duty during Spong's audit), and that he assumed her duties. Gutierrez testified that Patterson offered him the job, but he refused the offer because he did not believe he was ready to assume the GM's duties. Gutierrez testified that Patterson assigned Jessica, another

General Manager, to manage Tylersville. But Jessica was unable to be at the restaurant more than a few days a week, so a short time later, Patterson assigned Adena Reedy to manage Tylersville. Reedy, a female Restaurateur, also managed two other restaurants. (Doc. 59, Gutierrez Dep. at 27-28) Reedy continued training Gutierrez, who remained an apprentice manager. (Id. at 124-127) Patterson denied offering Verplank's job to Gutierrez because he did not believe Gutierrez was ready. Patterson agreed that Gutierrez essentially managed most day-to-day restaurant operations after Verplank left; he described it as a common practice at Chipotle that when a general manager left and no replacement was immediately available, the assistants would run the restaurant until a replacement arrived.

Verplank also contends that she was treated differently from similarly-situated males. She initially identified Omar Gutierrez, Angel Gonzales, and John Teglovic as male comparators who Patterson treated more favorably. These three men worked for Verplank as her Apprentice Manager, Service Manager, and Kitchen Manager, respectively. They were not General Managers, and their duties and responsibilities are not comparable to Verplank's. She also argues that male General Managers Jose Garduno, Scott Phillippo, and Christian Armenta received comparable audit scores but were not terminated, relying on their TL audit scores (discussed previously regarding Ochoa's claims). The evidence shows that there is a distinction between the TL audits, done largely by local managers, and SSR corporate audits. Spong described the SSR audits as intended to provide an objective "outsider's" evaluation, and several witnesses described them as very intensive. Co-plaintiff Jennifer Hernandez testified that the SSR audit was the "most scrutiny" given of all types of audits. (Doc. 60, Hernandez Dep. at

241)

Steve Botts was an R3 (managing three restaurants). His home-base restaurant failed an SSR audit on December 24, 2011, when his operations score was D-63, and the cash handling score was 12. Mobbs did not immediately fire Botts; he was demoted in March 2012 to manager of a single restaurant, and Mobbs eventually terminated him in May 2012. Christian Armenta's SSR audit on August 21, 2012 (operations score of D-62, and cash handling score of 5) did not precipitate his immediate termination. Jennifer Clarke, who performed SSR audits, said that a failing SSR audit did not automatically result in the discharge of a General Manager. (Doc. 49, J. Clarke Dep. Vol. I at 8-9) Spong agreed that a failing cash handling score would likely prevent a manager's promotion to RT, but he was unaware that a failing operations score could justify immediate termination. Based on this evidence, the Court will assume that Verplank can show that male managers were treated more favorably based on the result of one SSR audit.

Verplank argues that Chipotle's asserted explanation for her termination is a pretext. Verplank concedes that the SSR audit was "just terrible. There's no reason for it. It's unacceptable." (Doc. 70, Verplank Dep. at 201) Verplank could not understand the poor result because her recent TL audits were much better, and demonstrated improvement over the prior year. She asserts that new employees were working the shift that Spong observed, and she believes that the two managers she assigned to work that day should have been held accountable: "I don't know if [Spong] was having a bad day or what. Yes, the store was deployed very poorly and yes, it was, from the sounds of it was very dirty, but I wasn't the one that was working that day. I didn't

deploy those people, I didn't run that shift."  (Id. at 226)

Verplank concedes that she trained Gutierrez and Gonzales and chose them to run the restaurant in her absence; she cannot disclaim responsibility for the failing audit because she was not there.  Her co-plaintiffs Jennifer Hernandez and Stephanie Ochoa both testified that a General Manager is responsible for her staff and for the overall operation of the restaurant, whether she is on or off duty.  Michelle Small testified that as soon as she saw Spong's SSR audit report, she told Patterson to fire Verplank.  That decision was based on Spong's personal observations at the restaurant the day of the audit, as well as Patterson's similar observations later the same day.  An employer can demonstrate an honest belief in its reason for discharging an employee if it can establish "its reasonable reliance on the particularized facts that were before it at the time the decision was made."  Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998).  Verplank has not shown that Spong's and Patterson's observations were untrue, or that Chipotle did not honestly believe that those facts warranted her termination.  Verplank has not shown that the reason for her termination lacks a factual basis.

Verplank admits that Patterson never made any comments to her about her sex or gender.  And the record demonstrates that Spong gave women managers, including co-plaintiffs Cris Reynolds and Jennifer Hernandez, very high SSR audit scores, belying any suggestion that he would deliberately give her a failing audit score simply based on her gender.  Verplank also asserts that the SSR audit was an insufficient reason for her termination, because one failing score should not be enough to cause her termination.  But Small testified that a score of F on an SSR audit was a very rare occurrence.  Verplank responds that Christian Armenta's SSR operations score was "only" 3 points

higher than hers, yet he was not fired.  Verplank had a much longer tenure as a General

Manager (two and a half years) than did Armenta (one year) at the time of their SSR

audits.  Moreover, a numerical grading system by definition will include a cut-off point

dividing passing and failing scores; that fact does not suggest that use of such a grading

system is evidence of pretext.  While Verplank and her co-plaintiffs argue that the audits

are laden with subjective questions, the bulk of the inquiries are in fact objective and

fact-based.  These include whether all employees were washing hands every hour;

whether food temperatures were maintained; whether dishes and tables were clean;

and whether food safety checklists were completed every day.  Verplank cites Ransick's

assertion that Chipotle should have given her some warning before terminating her.  But

the record does not support the suggestion that Chipotle had a policy or practice of

giving such warnings, or that it failed to adhere to an internal disciplinary policy when it

terminated Verplank.

The Court concludes that the record does not give rise to a reasonable inference

that Chipotle's reason for terminating Verplank was a pretext for gender discrimination.

Chipotle is entitled to summary judgment on Verplank's claims.

6.    **Cristie ("Cris") Reynolds** was hired by Chipotle in February 2004 as an

assistant restaurant manager.  She was promoted several times, and in 2007 became

an Area Manager.  Following her 2010 annual review, Michelle Small and Brian

Patterson demoted her to General Manager effective January 31, 2011.  (Doc. 41-16,

Ex. O) They also demoted Cincinnati Area Managers Alan Clark and Bob Kadlec to

General Managers at the same time.  Small and Patterson made the decision to demote

all three, because the restaurants they each managed were not operating satisfactorily.

In addition, Reynolds and Clark had not developed any of their General Managers into Restaurateurs, and Kadlec had developed only one.  Patterson and Small agreed that the best way to help all three achieve success in the company was to demote all three to the position of General Manager, and give each of them the responsibility for one restaurant.

Reynolds did not view this as a disciplinary demotion; Small described it as an opportunity for Reynolds to "learn the Restaurateur culture."  (Doc. 82, Small Dep. at 51)  On Reynolds' 2010 year-end performance review, Patterson wrote that he was "thrilled" that Reynolds agreed to take on one restaurant as General Manager, as Patterson believed that Reynolds "has what it takes" to achieve Restaurateur status. (Doc. 65, Patterson Dep. Vol. 1 at 139-140)  Patterson gave Reynolds, Clark and Kadlec a choice of locations, and Reynolds chose the Miami-Oxford restaurant.

Reynolds agrees that a Restaurateur should be able to achieve an operations audit score of A, and a cash-handling score of 3 or less.  (Doc. 67, C. Reynolds Dep. at 258)  Shortly after Reynolds assumed her new position, Kim Sporleder conducted a TL audit on February 14, 2011.  Her operations score was B-82, and her cash audit score was 6.  Sporleder noted specific shortcomings in the restaurant's compliance with the cash handling policy; she wrote that Reynolds and the restaurant had "tons of potential" but it was "lacking some guidance and attention to details."  (Doc. 41-19, Ex. R) Jennifer Hernandez conducted a TL audit of Reynolds' restaurant on March 31, 2011, giving an operations score of B-80 and a cash handling score of 8.  Hernandez cited some of the same deficiencies in cash handling procedures that Sporleder had noted in February.  (Doc. 41-22, Ex. T)  Andy Ransick (whom Reynolds previously trained when

she was the General Manager at the University of Cincinnati restaurant), conducted a
TL audit on June 23. He gave Reynolds an operations score of A-90, and cash
handling score of 1. (Doc. 41-24) Around the same time, Patterson completed and/or
approved Reynolds' 2011 mid-year semi-annual bonus worksheet, in which he stated
that "Operations at Oxford are great" and "Team Oxford is ready for Michelle [Small].
They have a strong pipeline of great people!" He also noted that her "shopper review"
results were very good, and her TL operations audit average over the past six months
was 90%. Reynolds received an 11.4% bonus out of a possible 15%. (Doc. 65,
Patterson Dep. Ex. 4)

Andy Ransick became Reynolds's direct supervisor in July 2011. He completed
her mid-year performance review, giving her an overall rating of 2 out of 4. (Doc. 41-25,
Ex. W) He noted that her financials were "very solid," and that she "has done a great
job" at Oxford. Reynolds told Ransick that she would be ready for a visit from Michelle
Small (to assess her readiness for a final visit from Monty Moran) at the end of July.
Ransick sent an email to Patterson and others about his visit to Oxford on July 13,
2011, reporting that it "went really well" and that Reynolds' team was "firing on all
cylinders." He thought they would be ready for a Restaurateur visit within 90 days, if not
sooner. Patterson responded that Ransick's report was "promising" but reminded
Ransick that Reynolds "... has been there since February and her timing to get to RT
needs to be in Aug. ... [C]an they be ready in August?" Michael Triola (Chipotle HR
department) echoed Patterson's comments, responding to Ransick that he really
wanted to hear "that [Reynolds is] ready for Michelle [Small] in the next few weeks and
no longer, since she's been at Oxford for 5 months." (Doc. 76, Patterson Dep. Ex. 24)

Tim Spong conducted an SSR audit at Reynolds' restaurant on July 21, 2011, accompanied by Herman Mobbs (who was training to become Area Manager).  Spong had trained Reynolds when she was an Area Manager, and they had done many audits together.  Spong gave her an operations score of  A-95, but her cash handling score was 9.  (Doc. 41-26, Ex. X)  He asked Reynolds how it was possible for her to get a score that high, which was largely due to her failure to do her manager's cash-handling review once every two weeks.  He testified that Reynolds asked him to "alter the score because she was afraid she would get fired as a result of a failed cash-handling audit and a fail that big.  A 9 is a very bad score."  (Doc. 83, Spong Dep. Vol. I at 46)  Spong testified that in his experience, it is not common or typical for managers to be fired solely for an unacceptable cash handling audit score.  When Patterson saw the SSR results later that day, he sent an email to Reynolds (and copying Andy Ransick, Michelle Small, and Michael Triola), stating that the cash handling score "falls clearly on your shoulders.  With the tenure you have with us, it's hard to justify and comprehend your lack of follow-up in doing just the basics of our audit procedures. " (Doc. 41-27, Ex. Y)  Reynolds responded, saying "Yes, I agree that I clearly dropped the ball on this.  I have been seriously focused on my people and [operations].  I will not make any excuse because there is none."  (Id.)

Ransick conducted a TL audit of Reynolds' restaurant about three weeks later on August 11, 2011, and gave Reynolds an operations grade of A-99 and a cash handling score of 1.  (Doc. 41-28, Ex. Z)  This was just before Miami University opened for the fall term, when the restaurant sees a large increase in business.  When Spong saw Ransick's report, he emailed Patterson to say: "I have my doubts as to how thorough

[Ransick's] audit could possibly have been - to go from a 5 or so on cash [handling] down to a 1 in 3.5 weeks? ... I'll get out there for a re-audit likely prior to the end of Sept., but you may want to just inquire of [Ransick] is he certain that the restaurant is this excellent." (Doc. 76, Patterson Dep. Ex. 33)  It does not appear that Spong re-audited that fall, as the next audit cited is a TL audit on September 26 by Ransick and Patterson.  Reynolds' scores were C-75 for operations, and 4 for cash handling.  Three of the four cash handling points were due to missing signatures on three "comp" slips.  This audit was done after Miami University was in session, when the population of Oxford doubles.  In the summary section of the report, Ransick noted that restaurant procedures were in place but the crew lacked energy and enthusiasm.  He stated that Reynolds recognized "all of the opportunities within her restaurant and a plan was discussed between [Reynolds], Patterson and [Ransick]." (Doc. 41-29, Ex. AA)

Annie Campbell, an HR generalist and recruiter for Chipotle, visited the Oxford restaurant during the week of September 16, 2011, and emailed her generally favorable comments directly to Reynolds (with copies to Small, Ransick, Patterson, Triola, and Andreoni).  (Doc. 41-32, Ex. DD)  Small asked Campbell if she thought Reynolds was "ready" for a visit to assess Restaurateur status; Campbell replied "not now, but soon." She described the restaurant's shift change as "pretty rough," but also noted that some of the newly-hired staff had been there less than a week when Campbell visited the restaurant.

Maria Tremone, a Chipotle marketing representative, visited Reynolds' restaurant on November 2, and she reported her impressions to Ransick, Patterson, and Small (and others).  Tremone reported that Reynolds "believes that she will be RT ready by

December 1."  Small asked Tremone if she thought Reynolds could become a Restaurateur; Tremone responded that the restaurant "lacks consistency - they have their good days/bad days... . Lacking consistency is definitely the biggest aspect in my opinion that's holding them back.  Also, [Reynolds] has been in position for awhile now and has not achieved RT, but that doesn't necessarily mean she won't. ... I am very interested to see if she achieves her timeline."  (Doc. 41-31, Ex. CC)

Ransick audited again on December 22, 2011, and gave Reynolds an operations grade of A-91 and a cash audit score of 5.  (Doc. 41-30, Ex. BB)  Ransick testified that he was concerned that Reynolds was still making cash handling mistakes, wondering "how many times do we have to review" the system.  He described the required steps as "simple things," and he coached Reynolds to "slow down when you do your [daily cash reports], make sure they are a hundred percent before you put the things away ... So going through my head [was] why are we still talking about this."  (Doc. 66, Ransick Dep. at 74-75)  Based on her tenure and background, Ransick thought that Reynolds' chances of being promoted to Restaurateur were "slim to none" after this audit.  (Id.)

Michelle Small visited the Oxford store twice during Reynolds' tenure.  Her second visit was sometime in early January 2012, when she visited with Patterson and Mobbs.  Reynolds testified that during this visit, Small told her that she "loved my people, the restaurant, the food looked great, the restaurant was very clean and organized."  Reynolds did not have a chance to talk with Small or Patterson after their visit because Small was running late to catch a plane, and they all quickly left.  (Doc. 67, Reynolds Dep. at 148)  Small testified that after this visit, she did not put Reynolds on the list for a final Restaurateur visit because "empowerment" was lacking; Small said

that Reynolds "... was still running around doing everything herself.  She had the wrong people still on the team. ... My perception at the end, I think, would be that, you know, she just gave up."  (Doc. 82, Small Dep. at 128)  Mobbs recalled that he talked to some employees that day who were "disenchanted" about leadership, and he taught some employees how to cut cilantro.  (Doc. 63, Mobbs Dep. at 154-156)

Patterson testified that on the ride back to Cincinnati from Oxford after that visit, Small told him to terminate Reynolds.  (Patterson Dep. Vol. 2 at 349)  Small did not recall that Reynolds had been terminated, or that Patterson had terminated her.  Until her deposition was taken she thought that Reynolds had voluntarily resigned.  Small admitted that Patterson would not have terminated Reynolds without talking to her about it first.  (Doc. 82, Small Dep. at 131-132)  On January 9, 2012, Patterson and Ransick met with Reynolds and told her she was being terminated; her termination form cites unacceptable performance as the reason.  (Doc. 41-33, Ex. EE)  Chelsea Hull, a female, replaced Reynolds.  (Doc. 66, Ransick Dep. at 156)

Chipotle argues that Reynolds cannot establish a prima facie case.  She was replaced by a woman, and she cannot show that similarly-situated males were treated more favorably.  Chipotle claims that the only similarly-situated males with whom Reynolds can compare herself are Alan Clark, Bob Kadlec and Kevin Male.  Clark, Kadlec and Reynolds were all demoted in January 2011, and Male was demoted in March 2012.  All of them were Area Managers when they were demoted, and Chipotle claims it treated all four in the same fashion.  Patterson terminated Alan Clark on December 14, 2011, even though on his last SSR audit on July 20, 2011 he received an operations grade of A-100, and a cash handling score of 3.  (Doc. 41-37, Ex. II)  Bob

Kadlec quit voluntarily in October 2011. Kevin Male laterally transferred to a position in Chipotle's IT Department. Chipotle rejects any comparison with other male managers, suggesting such a comparison is irrelevant because Reynolds did not assert a failure to promote claim.

The Court rejects Chipotle's contention that the only similarly-situated males are the three who were demoted from Area Manager. Reynolds is not alleging that Chipotle failed to promote her; she is challenging her termination as General Manager. Chipotle cites her failure to be promoted to Restaurateur based on her audit scores as the primary reason she was terminated. Reynolds contends that other male General Managers were treated more favorably than she was, because they were allowed significantly more time to reach Restaurateur status, and were not fired after receiving comparable audit scores. Patterson and Small testified that by mid-2011, Chipotle expected all current General Managers to be promoted to Restaurateur within six to eight months. Andy Ransick agreed with Reynolds that the 6-8 month timeline was a change from prior policy. Ransick was promoted in December 2007 in North Carolina, and no one at Chipotle told him that there was any time limit. He recalled that the timeline "changed through the end of my career there. I want to say it was six to eight months was kind of the final expectation ... At first I don't think there was a time expectation and then I believe all of the team directors had a conference where Monty [Moran] had kind of set that six to eight month time frame with the mentality of, you know, if you haven't done it in six to eight months, what is going to change over the next six to eight months." (Doc. 66, Ransick Dep. at 31-32) Ransick said that two of his managers were terminated when they did not get promoted within that new timeframe

(presumably one of them was Reynolds).  (Id. at 33)  Ransick thought Chipotle got "a little bit carried away with their standards, expecting perfection" from their GM's, at least in Cincinnati. [10]

Reynolds was terminated in January 2012, less than eight months after the 6-8 month promotional timeline was announced to her at mid-year 2011.  Luis Martinez became a General Manager on December 7, 2009, and promoted to Restauranteur on February 20, 2013, more than 17 months after the 6-8 month timeline was announced in mid-2011.  Eduardo Pacheco-Reyna became a General Manager on November 7, 2011, he has not been promoted to Restaurateur and is still employed.  The same is true for Scott Phillippo (became General Manager April 11, 2011, not yet promoted); Isidro Vasquez (became General Manager on May 21, 2012, not yet promoted); and Rigoberto Vicente (became General Manager on August 27, 2012, not yet promoted).

Reynolds also contends that several male managers received TL audit scores similar to or worse than hers, but were not terminated.  As discussed previously, Jose Garduno became a General Manager on March 6, 2012; the TL audit scores of his restaurant in 2012 were D-69/6, D-69/9, C-73/4, C-75/2, C-75/6, and C-75/5.  He was not terminated, and he voluntarily left Chipotle in January 2014.  Christian Armenta (Kenwood GM) became a GM on August 15, 2011; he received audit scores of C-67/5 on September 30, 2011; C-69/4 on December 30, 2011; and C-71/5 on March 31, 2012.

---

[10]  Ransick testified that "people were dropping like flies ... across the board.  I felt like we were scaring the pants off everyone.  Nobody knew if they were going to be coming to work the next day and be secure in their job, which deterred people's motivation."  (Ransick Dep. at 49-50)  Ransick voluntarily left Chipotle in September 2012 because he was dissatisfied with the direction that the company was taking.

His SSR audit score on August 21, 2012 was D-62/5.  He was not terminated.   Scott Phillippo (Fountain Square GM) received audit scores of C-76/1 on August 14, 2011; C-74/5 on August 3, 2012; and D-69/5 on June 29, 2013.  Even though the auditor wrote in the report that Phillippo was "not yet" at the Restaurateur level, he was not terminated.

A plaintiff's prima facie burden is not intended to be an onerous one, and the Court finds that Reynolds has satisfied it by showing that several male General Managers were given a longer time to achieve promotion to Restaurateur, and were not terminated after comparable or worse audit scores despite their lack of promotion within 6-8 months.

Chipotle asserts that Reynolds was terminated due to her unacceptable performance and failure to get promoted, an explanation that Reynolds contends is pretext.  She argues that Chipotle's Cincinnati management team was "steeped in sexism."  She cites Patterson's comments that his wife made his travel arrangements and did his expense reports.  Patterson once asked Reynolds to go to Minneapolis to spend a few days with another female area manager who had a similar career path, to "share information, share ideas, that kind of thing."  Patterson explained that he couldn't teach Reynolds "how to be a woman at Chipotle."  (Doc. 67, C. Reynolds Dep. at 174-175)  If her employees got excited or passionate in describing their co-workers when he visited the restaurant, Patterson would ask why they were "so emotional."  (Id. at 177)  Reynolds felt that Patterson was uncomfortable around women, and at meetings he would socialize with men.  Reynolds complained to Candace Andreoni in October 2011 about Patterson's lack of support.  (Doc. 72, Andreoni Dep. Ex. 1)  But Reynolds did not

complain that Patterson was treating her differently because she was a woman. About the same time, Andreoni conducted an anonymous survey of all of Patterson's General Managers, male and female, seeking their input about Patterson's leadership and management abilities. Many of the responses Andreoni received echoed Reynolds' complaints: Patterson did not visit restaurants frequently enough, he did not offer consistent support, and he gave conflicting signals about the pathway to promotion. (Doc. 47, Andreoni Dep. at 101-112, and Exs. 2 and 3) Andy Ransick also criticized Patterson's management abilities, but thought that Chipotle did not give him enough help or support.

Patterson's comments to Reynolds about his wife, or Reynolds' observation that he sat or socialized with men during meetings, do not raise a reasonable inference that the actual reason Patterson fired Reynolds was her gender. A plaintiff's assertion that a male supervisor treated women more harshly than men, did not like "confident" women, and commented to a co-worker about plaintiff's "female problems" when she called in sick, were too generalized and conclusory to warrant an inference that the supervisor was predisposed to discriminate against women. This was especially true because the comments were not related to plaintiff's termination. See Wienke v. Haworth, Inc., 1993 U.S. App. LEXIS 854, *8-9 (6th Cir. 1993)(unpublished). See also Taylor v. The Union Inst., 30 Fed. Appx. 443, 450-451 (6th Cir. 2002), finding descriptions of a "discriminatory atmosphere," and the "attitude" exhibited by some individuals towards minorities, were not sufficient to raise a genuine factual dispute. Statements that directly express discriminatory attitudes are a different matter. For instance, in Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 355-356 (6th Cir. 1998), the

employer's president said that the company "is being run by white haired old men waiting to retire, and this has to change," and that he did not "want any employee over 50 years old" on his staff. These comments were neither ambiguous nor abstract, and together with other age-biased comments by other department members, reflected a "cumulative managerial attitude" that may well have resulted in discriminatory decision-making. The comments and incidents Reynolds cites do not rise to such a level. And Andreoni's survey results suggest that Patterson did not treat Reynolds in a manner that substantively differed from his other managers, male and female.

Reynolds cites her mid-year 2011 bonus worksheet, reflecting Patterson's decision to give her an 11.4% bonus only six months before she was abruptly fired. Ransick stated on her mid-year review that she had created a "great team and pipeline," and brought "a lot of energy and a positive attitude everyday." Her restaurant "achieved operational excellence under [Reynolds'] leadership," and he thought she would be promoted to Restaurateur "in the very near future." Her financial performance was "very solid." Both Ransick and Patterson urged Small to visit before the university opened in the fall (and the restaurant greatly increased its business), as they believed she was ready for promotion. Her June 2011 audit scores were A-90/1, and her August 2011 scores were A-99/1. Reynolds concedes the unacceptable cash handling score on her July 2011 SSR audit, but asserts that her fluctuating cash handling scores were certainly no worse - and in many cases far better - than the male General Managers who were audited in the same time period. Ransick and Todd Shock both visited her restaurant in December 2011, just before she was fired. They told Patterson that Reynolds had a "firm knowledge" of improvements to be made, a team of "future

Restaurateurs" in place, and they believed the "feel" of the restaurant was "cool." (Doc. 76, Patterson Dep. Ex. 26) Patterson responded by questioning Ransick whether Reynolds was "really" ready for a Restaurateur visit, but did not explain what he meant.

Small testified that Reynolds did not get promoted to Restaurateur because she did not create "empowerment" and "had the wrong people still on the team." Since Small is a female, Chipotle argues that the Court should infer that Small would not discriminate against Reynolds. But Reynolds responds that at the summary judgment stage, the Court is obligated to draw inferences in favor of Plaintiffs, who are the non-moving parties. Reynolds further cites the fact that while Chipotle claims that she was terminated for unacceptable performance, Patterson and Ransick noted on her termination form that she was eligible for rehire. If her performance was so unacceptable that it merited termination, it is puzzling why Chipotle would consider her eligible for rehire.

In its reply brief, Chipotle reiterates its reliance on the July 2011 SSR audit and Reynolds' admission that she "dropped the ball" on that audit, to argue that there can be no reasonable dispute about pretext. But Chipotle did not terminate Reynolds after that audit, and several subsequent audits showed improvement in cash handling. All of the evidence supports the contention that Chipotle considered Reynolds to be working towards promotion, right up to the last undocumented visit from Small, Patterson and Mobbs. Her performance reviews were very good, and her audit scores (except for July cash handling audit) were acceptable. Both Ransick and Shock felt she was a top performer only a few weeks before she was suddenly terminated. She has identified several male managers who received worse audit scores, but were not terminated

despite those scores, or because they were not promoted to Restaurateur within the new 6-8 month timeframe.  And Jennifer Clarke testified that it was possible for a General Manager to remain in that position for several years without being promoted to Restaurateur.  (Doc. 49, Clarke Dep. Vol. I at 8)

Based on the entirety of the evidence, the Court concludes that Reynolds has raised a genuine factual dispute about whether Chipotle's reasons for firing her were the actual reasons or were sufficient to motivate that decision.  Chipotle's motion for summary judgment with respect to Cris Reynolds' claims is denied.

7.     **Jennifer Hernandez** (f/k/a Jennifer Yacuzzi) was first employed at Chipotle in February 2004.  She was promoted to assistant manager in September 2006; and on July 21, 2008, Cris Reynolds and Morshed Chowdhury (a former Area Manager) promoted her to General Manager of the University of Cincinnati ("UC") restaurant.  Cris Reynolds was her Area Manager until Reynolds was demoted in early 2011.  When Hernandez began managing the UC restaurant in 2008, she fired several employees because they were preventing her from improving operations.  Cris Reynolds completed her 2009 performance evaluation, rating her 2 out of 4, meaning she was "outstanding in many areas" and "delivers excellent results in many aspects" of her position.  (Doc. 60, Hernandez Dep. Ex. 19)

Patterson and Small visited the UC restaurant on February 11, 2010 after a robbery took place.  Small was in Cincinnati for other reasons, but she and Patterson came to the restaurant to offer their emotional support to the employees.  After their visit, Cris Reynolds told Hernandez that Small noticed several things that needed improvement.  Small, Patterson and Reynolds visited again in the summer of 2010, to

assess if Hernandez was ready for promotion.  After this visit, Cris Reynolds told Hernandez that she needed more improvements in cleanliness, restaurant organization, and in standardizing the cut sizes of food being served.

On June 22, 2010, Tim Spong conducted an SSR audit at Hernandez's restaurant, giving her an operations grade of A-93, and a cash audit score of 1.  Spong commented that "[t]his was a really well run Chipotle restaurant."  (Doc. 87, Spong Dep. Ex. 36)  In July 2010, Hernandez was chosen to visit several Restaurateur-level restaurants in Chicago, to personally observe the culture of a successful Restaurateur. Around the same time, a Restaurateur from Chicago visited Hernandez's restaurant, and asked her why she had not been promoted.  He made some suggestions which Hernandez decided not to adopt.  She told Patterson, who did not disagree with her decision; he told her that the Chicago visitor gave him great feedback about her restaurant.  Patterson also chose Hernandez to perform TL audits at other restaurants because she was excellent at auditing.

During the latter half of 2010, Patterson and Cris Reynolds visited Hernandez's restaurant about twice a month, for "pop in visits" that were intended to serve as trial runs for a Restaurateur visit by co-CEO Monty Moran.  That year, Hernandez successfully trained Melvin Henriquez, who was promoted from her apprentice to General Manager for the new Kenwood Mall restaurant.  Cris Reynolds completed Hernandez's 2010 year-end review.  Reynolds noted that Hernandez was passionate about developing people, but "tends to want to see the best in everyone and has taken a chance on people that she should not have. ... She needs to learn to prioritize.  She often has too many irons in the fire. ... Jennifer knows what high standards are but is

unable to teach her team to see the same high standards.  Jennifer needs to maintain

consistent standards and teach her team to do the same." (Doc. 60, Hernandez Dep.

Ex. 20)  In her self-critique, Hernandez admitted that she did not maintain consistency

through the year, "resulting in some rough visits."  She also admitted to difficulties in her

inability to prioritize tasks, as "... having too many things going on at once, having too

many projects, that although they were intended to make my store better, [were]

ultimately standing in my way."  (Id. at 137)  Cris Reynolds advised her to "stand up" for

herself if there were too many people giving her input on how to run her restaurant,

because "every person is going to have their own input on how something is going to be

done".  (Id. at 138)  Reynolds rated her performance as 3 out of 4, a "reliable

contributor," and a step lower than her prior year's evaluation.  Hernandez testified that

the fourth quarter of 2010 was difficult for her because she lost two of her apprentice

managers (Melvin Henriquez was promoted to GM, and another was suddenly

deported).

     After Cris Reynolds was demoted in early 2011, Patterson became Hernandez's

Area Manager and supervisor.  Patterson completed Hernandez's July 2011 mid-year

performance review.  He criticized her high employee turnover rate (which by mid-year

had declined from over 200% to 123%), and her failure to develop a "pipeline" of

employees who were capable of becoming managers.  Hernandez concedes that by

mid-2011, she did not have an Apprentice or a Service Manager, and she had to work

many extra hours to keep the restaurant operational.  Several times in mid-2011, she

had to ask for help from other restaurant managers to staff her own restaurant.

Patterson transferred two employees to her restaurant who Patterson believed were

ready to be apprentices; but Hernandez had to fire one of them a short time later due to unacceptable conduct. Her mid-year review also summarized her restaurant's "Shopper Reviews," which did not meet Chipotle's goals. Her overall percentage was 78.1% "Great," 11.8% "OK," and 10.1% "Nope," which Patterson described as "very poor." (Doc. 42-10, Ex. I at 3) Patterson told Hernandez that new General Managers were expected to become a Restaurateur in 6 to 8 months, and current GM's such as Hernandez should be close to being promoted. He stated that Hernandez had "very few [Top Performers] at UC, your standards are not high enough and empowerment is not happening." (Id. at 4) Patterson gave Hernandez an overall rating of 4 out of 4 for the first six months of 2011, the lowest possible rating, and she did not get a mid-year bonus.

Stephanie Ochoa performed a TL audit of Hernandez's restaurant in May 2011. She gave Hernandez an operations score of C-75, and a cash handling score of 8. Ochoa noted that hot food was not being kept at the required temperature, the dining room was not properly cleaned, the cut sizes for meat and chicken were too big, and back-of-house cleanliness was just "OK." Ochoa testified that the front section of the restaurant was "filthy." (Ochoa Dep. at 206-207) Hernandez was not at work the week of this audit and does not believe it was a fair report. Andy Ransick conducted a TL audit on June 25, 2011; he gave an operations score of C-78, and cash handling score of 2. (Doc. 42-15, Ex. N) Ransick stated that cleanliness of the restaurant was "OK,", and he noted inconsistent cut sizes of food. Hernandez was not at the restaurant that day either, and she later fired the manager who was on duty. Ransick audited her restaurant again on August 12, 2011, when her results were C-75 for operations and a

cash handling score of 1.  Ransick rated the front section cleanliness as just "OK," dining room cleanliness was only 60%, and back section cleanliness received 50 out of 100 points.  Regarding her crew, Ransick was "not convinced that everyone deserves to be here."  (Doc. 42-17, Ex. P at 1)

Herman Mobbs became Hernandez's Area Manager in August  2011.  She first met him at a managers "patch" meeting he held in late August to introduce himself to his managers.  Mobbs told her that he had visited her restaurant sometime around July 23, when a temporary manager Patterson had assigned to open the restaurant was a no call/no show.  Patterson received a telephone call from one of Hernandez's employees that day, saying they could not get in the restaurant and were waiting for someone to open it.  Patterson was in Dayton at the time, so he asked Mobbs and Kevin Male to investigate the situation.  When they arrived, the restaurant crew had been waiting outside for several hours.  Mobbs told Hernandez that her employees were upset and used foul language when he arrived.  In her deposition, Hernandez explained that she had hurt her back a few days before this incident and was given muscle relaxers; her doctor told her she could not drive for several days.  She informed Patterson that she could not come to work, so Patterson assigned "Maria", an apprentice-ready service manager, to work at Hernandez's restaurant while she was out.  On the third day, Maria did not come to work and did not call in, which led to the situation Mobbs described.  Hernandez said her employees knew about her back problem and they did not call her for that reason; she heard about the incident later.

Mobbs came to the UC restaurant again sometime in late August to talk with Hernandez's apprentice manager, Esperanza.  Hernandez asked Mobbs to spend some

time with her that day, but Mobbs said he was too busy.  Hernandez testified that

Mobbs "always seemed too busy to answer even a simple question," but she conceded

that her interactions with him were very limited.  (Doc. 60, Hernandez Dep. at 216)

Mobbs conducted a TL audit at her restaurant on September 18, 2011, resulting in an

operations grade of F-51, and a cash handling score of 4.  (Doc. 42-18, Ex. Q)  He

described the restaurant's condition as "unacceptable" due to lack of cleanliness, the

overall "feel" of the restaurant, and the crew's failure to follow standard operating

procedures for food prep sheets and food storage.  He rated the dining room

cleanliness at 33%, front of house cleanliness as "No - 50%," and observed that the

food was not being kept at required temperatures.  Hernandez believes that Mobbs'

audit was unfairly critical; two of his negative comments on operations were about

situations that Patterson had approved (employees used a particular bowl for chicken

instead of rice, and a crew member had been given the keys and the alarm code for the

restaurant).  Hernandez also accuses Mobbs of "setting her up" for this audit.  She

believes that he went to her restaurant that day only because he learned that an

assistant manager whom Patterson had assigned to be on duty that day, had failed to

show up or call in.  Mobbs' audit report states that Laquisha Jetter, who was not a

regular UC restaurant employee, was working that day as the Service Manager "as a

favor for Jennifer [Hernandez]."  (Doc. 42-18, Ex. Q at 1)

When Patterson saw the results of Mobbs' audit, he decided to fire Hernandez.

He said his decision was based on that audit, the many visits he had with her over the

preceding months, and the August incident when her employees were left outside for

several hours.  Patterson said that Mobbs and Male described the crew's behavior that

day as "undisciplined, not following any kind of procedure, lack of any accountability, with the language the team was using.  So it was actually even more a dreadful culture than what is even represented in my ... visits...".  (Doc. 65, Patterson Dep. Vol. I at 199) Patterson and Mobbs went to the UC restaurant the next day following the audit. Patterson gave Hernandez her mid-year review which she had not yet seen, and told her she was terminated.

Chipotle contends that Hernandez cannot establish a prima facie case because she has not shown that she was replaced by a male, or that she was treated less favorably than similarly-situated males.  Hernandez alleged in her complaint that she was replaced by a male but did not identify her replacement.  In her deposition, she testified that Russell Behrman and Michael Brentmore (two apprentices) were transferred to her restaurant shortly before she was fired, and that Behrman was "technically my replacement."  (Doc. 60, Hernandez Dep. at 233)  Chipotle argues that Behrman was an apprentice manager who assumed some but not all of Hernandez's duties.  He was not a General Manager, and he did not replace Hernandez.  In the response brief, Hernandez contends that she was replaced by Cesar Coronado, relying on Chipotle's interrogatory response identifying Coronado.  Chipotle rejects this contention because the interrogatory asked Chipotle to identify anyone who "performed any of Hernandez's duties."  It did not ask who "replaced" Hernandez.  Chipotle asserts that Coronado performed "some" of her duties but did not "replace" her.   The interrogatory does not mention Behrman.  Chipotle has not identified who "replaced" Hernandez, if any one person did so.

In any event, Hernandez alternatively argues that male General Managers were

not terminated or disciplined for comparable or worse audit scores.  As discussed previously, Christian Armenta, General Manager at the Kenwood restaurant, was audited on September 30 and on December 30, 2011, receiving scores of D-67/5 and D-69/4, respectively.  His March 31, 2012 audit score was C-71/5.  Armenta was not terminated.  Jose Garduno, General Manager of the Union Center restaurant, was audited five times in 2012, with scores of D-69/6, D-69/9, C-75/2, C-75/6, and C-75/5.  Garduno was not terminated.  The Court already concluded that the audit scores are a reasonable basis upon which to compare Chipotle's treatment of Cincinnati area General Managers.  Hernandez's audit scores generally and those she received just a few weeks before Mobbs' last TL audit were well above passing.  Mobbs deducted points on his audit for two situations that had been approved by Patterson, which suggests that her operations score would have been higher if those points were not deducted.  Given the comparison of her audit scores and those of the male General Managers, and some uncertainty as to who may have "replaced" her, the Court will assume that Hernandez can establish a prima facie case.

Chipotle contends it terminated Hernandez due to her declining job performance. This is reflected in her worsening audit scores and performance reviews, her high employee turnover rate, and her failure to develop and train a sufficient number of employees.  Hernandez contends that this reason is pretextual.  She claims that Patterson and Mobbs treated male employees and managers more favorably. Patterson did not talk to her on some occasions when he visited her restaurant, and instead talked to Melvin Henriquez whom she was training.  She believes that Patterson's demeanor reflected his preference for males.  On one occasion, Patterson

interrupted her conversation with Annie Campbell. Sometime in late 2010, Hernandez told Cris Reynolds about her problems with Patterson, including his infrequent visits and lack of support (similar complaints that were voiced by many of Patterson's managers in Andreoni's survey, as discussed previously). Reynolds advised her to talk to Patterson, and to call the company's hotline if the situation did not improve. Hernandez did not do either of these things. Hernandez also admits that Patterson encouraged and supported her.

Hernandez saw Mobbs sit with other men when a group of managers had dinner one night after a managers meeting. She admits that Mobbs never made any discriminatory comments to her, and that she had very limited contact with him. Hernandez's subjective belief that Patterson and Mobbs appeared more comfortable with males, or that they talked to male employees more than females, is not sufficient to raise a genuine dispute that the actual reason she was fired is because Patterson and Mobbs discriminated against her based on her gender.

Hernandez does not substantively dispute many of the factual observations recorded in Mobbs' audit report, such as inadequate food temperatures, lack of cleanliness of the dining room, or lack of compliance with cash handling policies. In her 2010 year-end review, she admitted that some of these problems were occurring, yet her restaurant's operations continued to decline. One of her co-plaintiffs, Stephanie Ochoa, testified that Hernandez's restaurant was filthy, and gave her a less than satisfactory audit score (although Ochoa also said that some of the physical plant issues at the UC restaurant were not under Hernandez's control). Hernandez also asserts that Patterson did not show her the mid-year 2011 performance evaluation until

the day she was fired, apparently suggesting that Patterson wrote it simply to justify her termination.  But the manager evaluations in the record reflect that a six to ten week delay between the close of the evaluation period and the date that employees were given their evaluations was not uncommon.[11]  Chipotle also submits an excerpt from a bonus record worksheet dated August 4, 2011, on which Patterson listed Hernandez's performance rating ("4") and allocated no bonus to her for the mid-year 2011 period.  (Doc. 42-11, Ex. J)  This document negates her suggestion that Patterson created her negative review simply to support his decision to terminate her in September.

Hernandez admits that her "Shopper Review" results were unsatisfactory.  She asserts that Patterson and Mobbs did not give her appropriate credit for reducing her employee turnover rate from over 200% to 123%.  But Hernandez does not provide any context or factual basis upon which the Court could meaningfully compare those rates with turnover rates that may have been experienced by other General Managers.  Moreover, Hernandez had been the General Manager at UC since July 2008, more than three years before she was terminated.  Despite her tenure, she was unable to maintain consistent standards of cleanliness and staffing.  And she has no evidence that other male managers received a negative performance review (with a "4" performance rating) comparable to hers, which was quickly followed by a failing audit score.

The Court concludes that Hernandez has not established a genuine factual

---

[11] Alan Clark's year-end 2010 evaluation was signed on March 10, 2011 (Doc. 41, Ex. M); Stephanie Ochoa's year-end 2010 evaluation was signed on March 9, 2011 (Doc. 37, Ex. N); Tina Reynolds' 2010 year-end review was signed on March 10, 2011 (Doc. 38-14, Ex. M); Cris Reynolds' mid-year 2011 evaluation was signed on August 9, 2011 (Doc. 41, Ex. W).

dispute about pretext, and that Chipotle is entitled to summary judgment on her claims.

**CONCLUSION**

For all of the foregoing reasons, Chipotle's motions for summary judgment on the claims of Meghan Verplank (Doc. 40) and Jennifer Hernandez (Doc. 42) are GRANTED, and their claims are dismissed with prejudice.  Chipotle's motions for summary judgment with respect to the claims of Kerri Breeze (Doc. 36), Stephanie Ochoa (Doc. 37), Tina Reynolds (Doc. 38), Elizabeth Rogers (Doc. 39), and Cristie Reynolds (Doc. 41) are DENIED.

The Courtroom Deputy will contact counsel for the parties to set a scheduling conference to establish a trial schedule for the remaining Plaintiffs' claims.

SO ORDERED.

DATED: August 17, 2015                          s/Sandra S. Beckwith
                                                Sandra S. Beckwith, Senior Judge
                                                United States District Court